IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

KENNETH MOODY, # 51638                                        PETITIONER

versus                                        CIVIL ACTION NO. 2:04cv266-KS-MTP

DON CABANA and JIM HOOD                                      RESPONDENTS

<u>OPINION AND ORDER</u>

      BEFORE THE COURT is the *pro se* petition of Kenneth Moody for a writ of habeas

corpus filed under 28 U.S.C. § 2254.  Having considered the petition, the answer, the reply, the

amended reply, the record of the state court proceedings and the applicable law,  the court finds

that the petition should be denied.

PROCEDURAL HISTORY

      On April 10, 2001, petitioner, Kenneth Moody, was convicted of two counts of capital

murder by a jury in the Second Judicial District of the Circuit Court of Harrison County,

Mississippi,[1] for the deaths of William Hatcher and Robbie Bond (the underlying felony was the

sexual abuse of Bond).  Following a sentencing hearing, the jury was unable to reach a

unanimous decision as to punishment.  Thereafter, in an Amended Sentencing Order dated May

1, 2001, the trial judge (Hon. Richard W. McKenzie) sentenced petitioner, pursuant to Section

99-19-101(3)(c) of the Mississippi Code Annotated, to serve two consecutive terms of life

imprisonment in the custody of the Mississippi Department of Corrections.  *See* Supreme Court

Record (hereinafter "SCR") 330-32.  Petitioner moved for a judgment notwithstanding the

verdict, which was denied, and then directly appealed the judgment to the Mississippi Supreme

---

[1] Petitioner was indicted in the Circuit Court of Perry County, Mississippi, but pursuant to an order changing venue (on petitioner's motion), the trial occurred in the Second Judicial District of Harrison County, Mississippi.

Court.  On March 13, 2003, the Supreme Court of Mississippi affirmed petitioner's conviction and sentences by written opinion.  *Moody v. Mississippi*, 841 So. 2d 1067 (Miss. 2003). Thereafter, on March 5, 2004, petitioner filed a *pro se* "Application to Supreme Court for Leave to Proceed in Trial Court" with attached "Motion for Post Conviction Relief to Vacate and Set Aside Conviction and Sentence," which was denied on July 19, 2004:  "The Panel finds that the application fails to make a substantial showing of the denial of a state or federal right as required by Miss. Code Ann. § 99-39-27(5)."  *See* Exhibit B to State's Response to Petition for Writ of Habeas Corpus [13] (the "Answer").

Petitioner filed his *pro se* Petition for Writ of Habeas Corpus [1] (the "Petition) on August 11, 2004.  Petitioner enumerates twenty grounds[2] upon which he claims habeas corpus relief is warranted.  These grounds are paraphrased as follows:

Ground A: Petitioner was denied due process by the delay of his second indictment and the trial court erred in not dismissing his first indictment for speedy trial violations;

Ground B: Petitioner was denied his Sixth Amendment right to effective assistance of counsel by counsel's failure to raise the issue of a speedy trial violation on direct appeal;

Ground C: Petitioner was denied his Sixth Amendment and statutory rights to a speedy trial;

Ground D: Petitioner was prejudiced by the trial court allowing David Moody to testify;

Ground One: The trial judge gave an erroneous jury instruction on the presumption of innocence;

Ground Two: The jury was tainted by pre-trial publicity;

---

[2] The form for a 28 U.S.C. § 2254 habeas petition provides space for four grounds, confusingly labeled "A. Ground one," "B. Ground two," "C. Ground three," and "D. Ground four."  In his Petition, petitioner asserted these four grounds, and then asserted sixteen additional grounds, which he numbered One through Sixteen.  Accordingly, for ease of reference (and because this is how both petitioner and respondent have referred to these grounds throughout their briefing), the court will refer to the first four grounds as Grounds A through D, and the next sixteen grounds as Grounds One through Sixteen.

Ground Three: Petitioner was unfairly denied use of peremptory challenges;

Ground Four: Juror misconduct tainted the jury panel;

Ground Five: Petitioner was prejudiced by remarks made by a bailiff within the hearing of a prospective juror (who was eventually selected as a member of the petit jury); and he was denied his right to a fair trial when two uniformed officers led him into the courtroom in the jury's presence and sat beside him.

Ground Six: Petitioner's confession was coerced and therefore should have been suppressed;

Ground Seven: The court erred by assisting the State in the rehabilitation of one of its witnesses;

Ground Eight: Count Two of the indictment is defective as a matter of law;

Ground Nine: There was insufficient proof to sustain a conviction on Count Two of the indictment;

Ground Ten: The court erred in allowing Jody Newell to testify as to the vaginal swabs and slides taken from Robbie Bond;

Ground Eleven: The DNA evidence introduced at trial was unreliable;

Ground Twelve: The court erred in failing to grant a circumstantial evidence instruction to the jury on the underlying felony of sexual battery;

Ground Thirteen: The court erred in failing to grant a manslaughter instruction as to Count Two of the indictment;

Ground Fourteen: The court improperly instructed the jury during the sentencing phase;

Ground Fifteen: There was a violation of fundamental fairness in the capital prosecution; and

Ground Sixteen: Discovery violations by the state deprived petitioner of his right to due process.


THE STANDARD OF REVIEW

As the Petition was filed after the effective date of The Antiterrorism and Effective Death

Penalty Act ("AEDPA"), the AEDPA and case law interpreting it provide the standards under

3

which the Petition must be evaluated.  *See Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002),

*cert. denied*, 537 U.S. 1104 (2003).  As an initial matter, exhaustion of state remedies is a

mandatory prerequisite to federal habeas relief under 28 U.S.C. § 2254:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State Court shall not be granted unless it appears that–
> >    (A)  the applicant has exhausted the remedies available in the courts of the State;
> or
> >     (B)(I)  there is an absence of available State corrective process; or
> > >        (ii) circumstances exist that render such process ineffective to protect the
> > >             rights of the applicant.
>    . . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the
> courts of the State, within the meaning of this section, if he has the right under the law of
> the State to raise, by any available procedure, the question presented.

To satisfy the exhaustion requirement, the petitioner must first present his claims to the

highest state court in a procedurally proper manner so that it is given a fair opportunity to

consider and pass upon challenges to a conviction, before those issues come to federal court for

habeas corpus review.  *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999).  Exhaustion results

from the petitioner's pursuit of his claims through state courts either by direct appeal or by post-

conviction proceedings.  *See Orman v. Cain,* 228 F.3d 616, 619-20 & n.6 (5th Cir. 2000).  Along

with a determination of whether the petitioner has exhausted state court remedies, the court must

also determine whether the state court has decided the asserted claim on the merits.  It is

undisputed in this case that petitioner exhausted his state court remedies with respect to all of the

instant claims and that these claims were decided on their merits.[3]

---

[3] Respondent concedes (and this court finds) that Grounds One through Thirteen were
reviewed by the Mississippi Supreme Court on direct appeal and denied on the merits, and
Grounds A through D and Fourteen through Sixteen were reviewed by the Mississippi Supreme
Court on petitioner's motion for post-conviction relief and denied on the merits.  *See* Answer at
21-22.

AEDPA provides that where the state court has adjudicated a claim on the merits, habeas relief is barred except under very limited circumstances. "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgement of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Federal courts review pure questions of law, as well as mixed questions of law and fact, under subsection (d)(1). *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000); *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir. 1998). The "unreasonable application" inquiry is based on an objective standard, and for purposes of the (d)(1) analysis, "unreasonable" does not equate with "incorrect." *Garcia v. Dretke,* 388 F.3d 496, 500 (5th Cir. 2004). Rather, the application of clearly-established precedent must be both incorrect *and* unreasonable for federal habeas relief to be warranted. *Id.*

Pure questions of fact are reviewed under subsection (d)(2). *Corwin,* 150 F.3d at 471. Determination of a factual issue made by a state court is entitled to a presumption of correctness which the petitioner has the burden of rebutting by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *See also Schriro v. Landrigan*, 127 S.Ct. 1933, 1939-40 (2007).

It is against this backdrop that petitioner's claims must be reviewed – with the added caveat that a federal court does not "sit as a 'super' state supreme court" and may decide the issues presented by the habeas petition "only to the extent that federal constitutional issues are

implicated." *Smith v. McCotter,* 786 F.2d 697, 700 (5th Cir. 1986); *see also Mendiola v. Estelle*, 635 F.2d 487, 491 (5th Cir. 1981). "It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension." *Wainwright v. Goode*, 464 U.S. 78, 83-84 (1993) (citations omitted). Thus, AEDPA provides that the court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 29 U.S.C. § 2254(a) (emphasis added). A state's interpretation of its own laws or rules is no basis for federal habeas corpus relief since no constitutional question is involved. *Bronstein v. Wainwright*, 646 F.2d 1048, 1050 (5th Cir. 1981) (citations omitted).

Ground A

In Ground A, petitioner claims his due process rights were violated by excessive delay between the first and second indictments and by the trial court's failure to dismiss the first indictment for violation of his right to a speedy trial.[4]

The United States Supreme Court has set forth a two-part test for analyzing pre-indictment delay:[5] 1) whether there is actual prejudice to the defendant; and 2) whether the prosecution

---

[4] Petitioner was arrested on May 18, 1995 and was subsequently indicted on August 1, 1995, along with his cousin, David Moody, for two counts of capital murder, with the underlying felony being the rape of Robbie Bonds. *See* Exhibit C to Answer. There is no indication that the initial indictment was dismissed; however, petitioner was re-indicted on December 21, 2000, this time for two counts of capital murder with the underlying felony being the sexual battery of Robbie Bonds. SCR 9-10. The second indictment did not include David Moody as a co-defendant. Petitioner's instant conviction arises from the charges alleged in the second indictment.

[5] As respondent notes, petitioner's claim is not one of pre-indictment delay *per se*, but, rather, is a claim of excessive delay between the first and second indictments. However, the analysis is the same. *Cf. Beckwith v. Anderson*, 89 F.Supp. 2d 788 (S.D. Miss. 2000) (analyzing due process claim based on delay between mistrial and second indictment as a pre-indictment

intentionally delayed indictment to gain a tactical advantage over the defendant.  *U.S. v. Marion*, 404 U.S. 307, 325 (1971); *see also U.S. v. Gouveia*, 467 U.S. 180, 192 (1984) ("[T]he Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.") (citations omitted).  The burden of proving a due process violation based on pre-indictment delay is on the defendant.  *U.S. v. Beszborn*, 21 F.3d 62, 65-66 (5th Cir. 1994).

Petitioner argues that the prosecution deliberately delayed bringing the second indictment until they were ready for trial so that he would not be able to raise a statutory speedy trial claim.  However, there is no indication that the prosecution intentionally delayed indictment to gain a tactical advantage.  Indeed, a substantial portion of the time period between the first and second indictments can be attributed to an interlocutory appeal filed by petitioner pursuant to the trial court's refusal of a plea agreement entered into between him and the government.[6]  After the plea agreement was declared void, the prosecution was forced to re-evaluate the case and determine

---

delay claim).

[6] Petitioner had initially signed a plea agreement on June 22, 1995 in which, *inter alia*, he agreed to plead guilty to both counts in the indictment and testify against his cousin, David Moody (as well as another cousin, Richard Moody) in exchange for two consecutive life sentences - *i.e.*, the government would not seek the death penalty.  The trial court refused to honor the plea agreement by order dated March 26, 1996.  *See* Exhibit D to Answer.  Petitioner then brought an interlocutory appeal to the Mississippi Supreme Court and on June 11, 1998, the Court held that the judge had abused his authority and that the plea agreement should be enforced.  *See Moody v. State*, 716 So. 2d 592 (Miss. 1998).  Thereafter, upon remand to the trial court for enforcement of the plea agreement, petitioner changed his mind and refused to plead guilty, and an order revoking the plea agreement was entered on September 28, 1998.  *See* Exhibit E to Answer.  In its opinion upholding David Moody's conviction (for the capital murders of Robbie Bond and William Hatcher), the Mississippi Court of Appeals took judicial notice that petitioner's interlocutory appeal "came at a time when the appellate system of the State was experiencing substantial delays brought on by an excessively crowded docket that had existed for a number of years."  *Moody v. State*, 838 So. 2d 324, 330 (Miss. Ct. App. 2002).

what evidence was available and what still needed to be processed through the state crime lab. *See* Answer at 26.  Such investigative delay does not violate due process.  *See*, *e.g.*, *U.S. v. Lovasco*, 431 U.S. 783, 796 (1977), *reh'g denied*, 434 U.S. 881 (1977) (holding that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.").

Other reasons for pre-trial delay include numerous changes in defense counsel and the appointment of special prosecutors on two occasions.  Petitioner was initially represented by Robert B. Helfrich, who withdrew from the representation in order to take a job with the district attorney's office.  Thereafter, on February 23, 1996, the trial court appointed Michael Adelman and Alison Steiner to represent petitioner.[7]  Further, the addition of Mr. Helfrich to the district attorney's staff served to disqualify the district attorney's office from involvement in petitioner's case, thus requiring the appointment of a special prosecutor, Frank Carleton.  On June 16, 1998, the trial court appointed Ray Price and Jeff Hall to serve as special prosecutors in place of Mr. Carleton.[8]  On June 22, 1998, the trial court entered an order permitting defense attorneys Adelman and Steiner to withdraw from the case (it is unclear why) and appointed Clifton Gaddis and Lisa Sellers to serve as defense counsel.  Thereafter, on May 2, 2000, petitioner filed a "Pro Se Motion to Appoint Defendant a New Attorney" in which petitioner expressed his

---

[7] On appeal by David Moody, the Mississippi Court of Appeals addressed the issue of delays caused by defense counsel going to work for the district attorney's office, thereby necessitating the appointment of special prosecutors: "While the delays caused by such difficulties in the conduct of prosecution are regrettable, they are the sort of things that inevitably arise and there is no evidence that the necessary transitions were unduly delayed without justification."  *Moody*, 838 So. 2d at 331.

[8] Respondents state that they are unaware of why this substitution occurred.  *See* Answer at 29-30.  According to petitioner, the trial judge fired Mr. Carleton because he refused to seek the death penalty.  *See* Memorandum in Support of Petition [2] (the "Memo") at 9.

dissatisfaction with Mr. Gaddis.  *See* Memo at 61, 63-64, 71, 77-80.  Subsequently, on June 3, 2000, William Kirksey was appointed to serve as defense counsel.  *See* Exhibit J to Answer.

In addition, it is noteworthy that petitioner filed for a continuance on January 10, 2000, stating:

> That due to circumstances beyond the control of this
> Defendant, the trial of this case cannot be held on the
> day previously contemplated, for the reason that certain
> administrative matters, including but not limited to the
> [mental] examination of the Defendant by Whitfield,[9]
> have not been accomplished, and that the Defendant and
> the State of Mississippi are precluded from proceeding in
> this matter at this time, and that this Court should make
> appropriate provision for a trial setting which will give the
> State and the Defendant an appropriate time frame within
> which to try this case.

Exhibit F to Answer.  In the court's order sustaining the motion for a continuance, the court specifically found that defendant "waive[d] any legal rights concerning a speedy trial, as a result of this continuance."  Memo at 75.  Finally, respondents argue that this case involved a great deal of physical evidence that had to be processed through the state crime lab, as well as DNA evidence that was processed out-of-state.  Thus, the complexity of the case contributed to the delay, as well.  *See* Answer at 31.

The court finds that petitioner has failed to establish that the prosecution intentionally delayed bringing the second indictment in order to gain a tactical advantage over the defendant.

---

[9] It is true that part of the delay stemmed from a delay in the state conducting a mental assessment of petitioner, as requested by petitioner and as ordered by the trial court on August 3, 1995.  As of July 23, 1999 - because of "some inadvertence" -  that assessment still had not taken place, so the court again ordered that it be conducted "at the earliest possible date." However, at the time petitioner moved for a continuance on January 10, 2000, that evaluation still had not taken place, which is part of the reason why he was requesting a continuance.  *See* Memo at 56-58, 68-70, 72-74.  It is unclear what the reason was for the delay, but there has been no showing that it was intentional in order to secure a tactical advantage over petitioner.

9

In addition, for the reasons set forth below, petitioner cannot establish that he suffered any cognizable prejudice as a result of the delay.

"The law is well settled that it is actual prejudice, not possible or presumed prejudice, which is required to support a due process claim." *Beszborn*, 21 F.3d at 66. In the absence of proof of actual prejudice, a due process claim is "merely speculative." *Beckwith v. Anderson*, 89 F.Supp. 2d 788, 808 (S.D. Miss, 2000) (*citing Beszborn*, 21 F.3d at 67). Thus, "[t]he mere passage of time is insufficient to prove prejudice to the defendant." *Id.* (*citing U.S. v. Butts*, 524 F.2d 975, 977 (5th Cir. 1975)).

Petitioner's first ground of alleged prejudice is that he lost his right to bring a statutory speedy trial claim. *See* Memo at 4-5. Mississippi's speedy trial statute requires a criminal trial to begin within 270 days after an accused has been arraigned. Miss. Code Ann. § 99-17-1. Petitioner claims that the delay in bringing the second indictment effectively took away his statutory speedy trial claim since his trial commenced on March 27, 2001 - which was only three months after the second arraignment.[10] *See* Petition at 4; Memo at 4-6, 82. In other words, petitioner's claim is that had the first indictment been dismissed pursuant to petitioner's July 19, 1999 motion, and a second indictment entered immediately thereafter, petitioner would have been able to claim a violation of his statutory right to a speedy trial, as his trial would have commenced more than 270 days after the second arraignment would have been held. However, this argument is entirely speculative as to what would have occurred if the judge had dismissed the first indictment and, of course, it assumes that petitioner's motion to dismiss had merit.

Petitioner also claims that he lost several potential witnesses as a result of the delay. A

---

[10] The 270 period runs from the date of arraignment on a reindictment, not from the original indictment. *See*, *e.g.*, *Corley v. State*, 584 So. 2d 769, 771-72 (Miss. 1991); *Galloway v. State*, 574 So. 2d 1, 2 (Miss. 1990).

petitioner seeking to establish that the death or unavailability of a potential witness caused him prejudice must produce evidence that the potential witness' testimony "was exculpatory in nature, or that it would have actually aided the defense."  *U.S. v. West*, 58 F.3d 133, 136 (5th Cir. 1995) (*citing Beszborn*, 21 F.3d at 66); *see also Beckwith*, 89 F.Supp. 2d at 808.

Petitioner avers that his father, who died ten days before trial, would have been a critical witness.  According to petitioner, his cousin, David Moody, told his (petitioner's) father that he (David) "killed Robbie Bond with a sledge hammer and that petitioner told him to do it."  Reply to Answer [15] (the "Reply") at 2.  Petitioner further argues that he lost the potential testimony of his uncle, David Moody's father, who also died before trial.  According to petitioner, his uncle told him that he would have testified that David had bragged to him before he was arrested that he (David) killed Robbie Bond.  Reply at 3; *see also* Memo at 13.  However, this potential testimony likely would have been inadmissible hearsay.[11]  And even if this testimony were admissible, it is not at all clear how it would have helped petitioner's defense.  Petitioner does not assert that either his father or his uncle would have testified that David confessed that petitioner had *no*

---

[11] *See* Rules 801 and 802 of the Mississippi Rules of Evidence ("MRE").  Petitioner has not shown how these statements would have fit into any of the exceptions to the hearsay rule.  In particular, the court notes that the statements likely would not have been admissible under MRE 804(b)(3) as statements against interest, since that rule requires that a declarant (*i.e.*, David Moody) be "unavailable" (arguably the case here, as the record reflects that David was called as a witness at trial and that he invoked his Fifth Amendment privilege, *see* Tr. 1874-84) *and* that where a proffered statement tends to expose the declarant to criminal liability and is being offered to exculpate the accused, it is not admissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement" (emphasis added).  For the same reason, the statements likely would not meet the requirement of  "Other Exceptions" that they have "equivalent circumstantial guarantees of trustworthiness."  *See* MRE 803(24), 804(b)(5).  Nor, of course, would the statements be admissible as co-conspirator statements, as such statements are only admissible when being offered *against* a party's co-conspirator - and further, such statements must have been made "during the course and in furtherance of the conspiracy."  *See* MRE 801(d)(2).  Finally, petitioner has not shown that these statements would meet any of the other hearsay exceptions set forth in MRE 803.

involvement in the crimes.  Thus, at best, as petitioner acknowledges, this testimony might have established that petitioner was an accessory to murder.  Reply at 2-3.  In Mississippi, "[e]very person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such."  *Scarborough v. State*, 956 So. 2d 382, 386 (Miss. Ct. App. 2007) (*quoting* Miss. Code Ann. § 97-1-3); *see also Malone v. State*, 486 So. 2d 360, 364 (Miss. 1986) ("One who is an accessory before the fact or one who aids and abets necessarily enters into an agreement that an unlawful act will be done.  He participates in the design of the felony."); *Crawford v. State*, 97 So. 534, 534 (Miss. 1923) (holding that in order to be held criminally liable as an aider and abetter in the commission of a felony, one must "do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime.").  Finally, "[e]ven assuming these individuals could have and would have provided exculpatory testimony, either [petitioner] or his attorney should have taken adequate steps to preserve their testimony for trial."  *Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167 (1994).[12]

Petitioner also avers that his father would have been a critical mitigating witness at the sentencing phase of the trial as to petitioner's drug use, mental deficiencies and the environment within which he grew up.  However, this too cannot establish the requisite prejudice, as petitioner did not receive the death penalty but, rather, received the lightest sentence available under the law

---

[12] On March 5, 2001, petitioner requested that the trial judge allow petitioner's father to be deposed by video, because he was in the hospital and would have been unable to travel to testify at trial.  *See* Transcript (hereinafter "Tr.") at 212-13.  The court agreed.  *Id.* at 213.  However, Mr. Moody died before the deposition could be taken.  *See* SCR 158; *see also* Tr. at 226, 2527-30.  It is unclear why petitioner waited until just before trial to make that request, considering that, as represented by petitioner's attorney to the court, his father "ha[d] been ill for some time."  Tr. 212.  Indeed, by petitioner's own admission, his father "had been given 6 months to live in the spring of 1997."  Reply at 3.

- life imprisonment.  Thus, the unavailability of petitioner's father to testify at his sentencing hearing in an attempt to avoid the death penalty is irrelevant.  *See Moody v. Wilson*, 2007 WL 892445, at * 14 (S.D. Miss. Mar. 21, 2007) (rejecting same argument made by David Moody in his *habeas* petition).[13]

Petitioner argues that another potential witness - his ex-girlfriend Sandra - would have "refute[d] allegations that petitioner was seen at the crime seen [*sic*] doing something."  Reply at 4; *see also* Memo at 12-13.  Petitioner further avers that on the night the crimes took place, he spent a few hours with Sandra and that she was a potential alibi witness.  Reply at 4.  Petitioner argues that Sandra was unavailable at trial because she had married and moved away, she had to take care of her kids, and her husband was "jealous"and did not want her around him.  *Id.* at 3-4.  However, petitioner has not established that Sandra was unavailable at the time of trial, as there is no indication that any effort whatsoever was made by the defense to actually procure her testimony.  Petitioner also argues that due to the delay, Sandra's memory would have faded and she may not have remembered anything.  *Id.* at 4.  However, there is no proof that, in fact, Sandra's memory had lapsed due to the passage of time.  *See Beszborn*, 21 F.3d at 67 ("Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from pre-indictment delay."  Such an argument of prejudice is "generally viewed with disfavor when, as here, the allegation is not supported by the production of the witness who allegedly would have altered the outcome of the trial."  *Cowart v. Hargett*, 16 F.3d 642, 648 (5th Cir. 1994), *cert. denied*, 513 U.S. 886 (1994).  Moreover, there is no indication that petitioner made any effort to preserve Sandra's testimony for trial.  *See Robinson*, 2 F.3d at 571.

---

[13] In addition, the court notes that petitioner's mother, Joyce Watson, testified at length at his sentencing hearing regarding these very issues.  *See* Tr. at 2472-98.

Finally, petitioner argues that the pre-trial delay contributed to the amount of pre-trial publicity, thereby preventing an impartial jury from being seated, and that the DNA evidence degraded and became unreliable.  Reply at 4; Memo at 13-14.  As for pre-trial publicity, this is a separate claim (Ground Two) which will be addressed *infra* and disposed of on its merits.[14]  With respect to the DNA evidence, this is also the subject of a separate claim (Ground Eleven) which will be addressed *infra* and also disposed of on its merits.  Thus, neither of these grounds can establish the requisite prejudice.

Accordingly, for the reasons set forth above, the court finds that the Mississippi Supreme Court's decision rejecting petitioner's due process claim was not contrary to, nor an unreasonable application of, clearly established federal law, and therefore habeas relief on this claim is denied.

Ground C[15]

In Ground C, petitioner complains that he was denied his constitutional right to a speedy trial.[16]

In *Barker v. Wingo*, 407 U.S. 514 (1972), the U.S. Supreme Court established the four-part balancing test to be used for determining whether a defendant received a speedy trial within the

---

[14] It is also worth noting that petitioner has not shown, nor is there any reason to believe, that pre-trial publicity increased or somehow worsened as a result of the delay in bringing petitioner to trial.

[15] This ground is being addressed out of order, as it is closely related to Ground A.

[16] To the extent that petitioner is asserting a violation of his statutory right to a speedy trial under Section 99-17-1 of the Mississippi Code Annotated, this is clearly not a proper claim for habeas relief.  *See* 29 U.S.C. § 2254(a) (providing that the court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (emphasis added).

meaning of the Sixth Amendment.  *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000).  The

*Barker* analysis requires the court to consider the "[l]ength of delay, the reason for the delay, the

defendant's assertion of his right, and prejudice to the defendant."  *Barker*, 407 U.S. at 530.  The

first factor - the length of the delay - serves as the "triggering mechanism.  Until there is some

delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors

that go into the balance."  *Id.*  Since the delay between petitioner's arrest on May 18, 1995 and the

commencement of his trial on March 26, 2001 was more than a year, it may be regarded as

"presumptively prejudicial" for purposes of prompting conducting a full *Barker* analysis.  *See U.S.*

*v. Frye*, 372 F.3d 729, 737 (5th Cir. 2004), *reh'g & reh'g en banc denied*, 115 Fed. Appx. 765

(July 13, 2004), *cert. denied*, 543 U.S. 1155 (2005); *Robinson v. Whitley*, 2 F.3d 562, 568 (5th

Cir. 1993).  Once a court undertakes a full *Barker* analysis, it evaluates the first three factors "in

order to determine whether prejudice will be presumed or whether actual prejudice must be

shown."  *Frye*, 372 F.3d at 736.

The first factor in the *Barker* analysis is length of delay.  In this case, it was more than six

years between petitioner's arrest and the commencement of his trial.  This factor obviously weighs

heavily in favor of petitioner.  *See, e.g., U.S. v. Bergfield*, 280 F.3d 486, 489 (5th Cir. 2002).

As for the second factor -  the reasons for the delay - "[a] deliberate and intentional delay

by the prosecution for the purpose of hindering the defense or otherwise gaining a tactical

advantage is weighed heavily against the state."  *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir.

1994), *cert. denied*, 513 U.S. 886 (1994).  On the other hand, "[a]n unintentional and inadvertent

delay...is weighed much less heavily."  *Id.*  As the Supreme Court explained:

> Between diligent prosecution and bad-faith delay, official
> negligence in bringing an accused to trial occupies the
> middle ground.  While not compelling relief in every case
> where bad-faith delay would make relief virtually automatic,

> neither is negligence automatically tolerable simply because
> the accused cannot demonstrate exactly how it has prejudiced
> him.

*U.S. v. Doggett*, 505 U.S. 647, 656-57 (1992).  Moreover, "[w]here the state advances valid

reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in

favor of the state." *Id.* (*citing Barker*, 407 U.S. at 531).

The reasons for the delay in bringing petitioner to trial were discussed at length *supra* with

respect to his due process claim, and will not be repeated here.  As discussed above, a good

portion of the delay can be attributed to petitioner.  The portion of the delay that can be attributed

to the state constitutes either unintentional and inadvertent delay, or is justified by valid reasons.

Petitioner himself has conceded that he can only legitimately claim a delay of eighteen months.

*See* Memo at 9.  And there has been no showing that the state engaged in any bad faith delay

Accordingly, the court finds that this factor favors the state.

The court will now examine the third factor - whether petitioner effectively asserted his

right to a speedy trial.  On July 19, 1999, petitioner filed a "Motion to Dismiss; Or, In the

Alternative, To Exclude Evidence" in which he raised the speedy trial issue.  *See* Memo at 52-55.

However, in his motion, petitioner did not request a speedy trial but, rather, he asked for a

dismissal.  *Id.*  It is well-established that a request for dismissal is not a valid demand for a speedy

trial.  *See Frye*, 372 F.3d at 739 (holding erroneous the trial court's finding this factor in favor of

defendant where he "did not claim the speedy trial right in order to obtain a speedy trial, but in

order to have the indictment dismissed"); *Cowart*, 16 F.3d at 647 ("[A]n assertion that charges be

dismissed for a speedy trial violation is not a value protected under *Barker*.") (*citing Hill v.

Wainwright*, 617 F.2d 375, 379 (5th Cir. 1980)).  Thus, this factor is given "strong evidentiary

weight" in favor of the state." *Id.* (*citing Barker*, 407 U.S. at 531).   Moreover, the court notes

that petitioner's motion to dismiss was filed more than four years after he was arrested, which hardly indicates that petitioner was making an effort to assert his speedy trial rights.[17]  *See Frye*, 372 F.3d at 739 (noting that amount of time that lapsed before defendant made a formal request for a speedy trial (one year from initial indictment) "cuts against presuming prejudice.").

The fourth *Barker* factor is prejudice to the defendant.  "Since the first three factors do not weigh heavily against the state, [petitioner] must make an affirmative showing of actual prejudice."  *Cowart*, 16 F.3d at 647.  The Supreme Court has identified three interests which the constitutional right to a speedy trial seeks to safeguard: 1) preventing oppressive pretrial incarceration; 2) minimizing anxiety and concern of the accused; and 3) limiting the possibility that the defense will be impaired.  *Id.* (*citing Barker*, 407 U.S. at 532).  Petitioner argues that he was prejudiced by the delay as follows: he was abandoned by his friends; he lost his job resulting in a lack of financial resources to hire his own attorney; he lost emotional support due to the death of close relatives; he lost the testimony of potential witnesses (his ex-girlfriend, father and uncle); the delay contributed to the amount of pre-trial publicity, thereby preventing petitioner from seating an impartial jury; "it is questionable" whether he could have received a death sentence under the first indictment, whereas he was eligible under the second indictment; and DNA evidence became degraded and therefore unreliable.  *See* Memo at 12-13.

As to the first interest, respondent concedes that the amount of pretrial incarceration - almost six years - was "substantial."  Answer at 33.  However, as discussed above, a significant

---

[17] Petitioner avers that he recalled sitting in open court with his attorney (he does not say when) and asking her if a speedy trial motion had been filed, and she responded yes.  *See* Statement filed by Petitioner on October 5, 2006 [17].  However, there is nothing in the record to substantiate this.  Petitioner also asserts that his attorney demanded a speedy trial in open court on July 22, 1998.  Memo at 11.  Unfortunately, the record from his proceeding has not been transcribed, so this assertion cannot be confirmed.  *See* Answer at 32.  At any rate, as discussed below, petitioner cannot establish prejudice.

portion of the delay can be attributed to petitioner.

As to the second factor, "[a]nxiety about one's reputation and private life during pretrial delay...will not alone suffice to warrant a reversal of a conviction." *Cowart*, 16 F.3d at 647. *See also U.S. v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002), *cert. denied*, 538 U.S. 1014 (2003) (holding that claims of "psychological and economic strain" are insufficient to establish necessary prejudice); *U.S. v. Avalos*, 541 F.2d 1100, 1115 (5th Cir. 1976) ("Anxiety of the sort 'present to some degree in virtually every case' does not amount to actual prejudice.") (citation omitted); *Beckwith v. Anderson*, 89 F.Supp. 2d 788, 802 (S.D. Miss. 2000) (holding that anxiety about one's personal and/or family life, and ordinary financial strains imposed by a criminal prosecution not enough to establish prejudice).

Finally, as to the third factor, based on the analysis set forth *supra* with respect to petitioner's due process claim, the court finds that petitioner has failed to establish that his defense was prejudiced by the delay.[18]

Thus, for the reasons set forth above, the court finds that the Mississippi Supreme Court's decision rejecting petitioner's speedy trial claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Therefore, habeas relief on this claim must be denied.

---

[18] Petitioner also argues that he was prejudiced because he could not have received a death sentence under the first indictment. The court is not exactly clear on what petitioner is arguing. Under the first indictment, petitioner was charged with two counts of capital murder with the underlying crime being the rape of Robbie Bond, and under the second indictment, petitioner was charged with two counts of capital murder with the underlying crime being the sexual battery of Robbie Bond. *See* Exhibit C to Answer; SCR 9-10. Rape and sexual battery are both underlying offenses for a capital murder charge. *See* Miss. Code Ann. § 97-3-19(2)(e). Therefore, under both the first and second indictments petitioner was eligible for the death penalty. *See id.* at §§ 97-3-21, 99-19-101(1). At any rate, petitioner did not, in fact, receive a death sentence and therefore the court fails to see how this claim could have any merit.

Ground B

In Ground B, petitioner claims he was denied effective assistance of counsel because his attorney, William Kirksey,[19] failed to raise the issues of due process and speedy trial violations on direct appeal.

Given that an ineffective assistance of counsel claim presented for habeas review presents a mixed question of law and fact, *Nixon v. Epps,* 405 F.3d 318, 324 (5th Cir. 2005), and that *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny are the "clearly established Federal law" which govern such claims, the section 2254(d)(1) issue in this case is "whether the Mississippi Supreme Court's decision to reject [petitioner's] ineffective assistance claim 'involved an unreasonable application' (and not merely an incorrect application) of *Strickland.*" *Neal v. Puckett,* 286 F.3d 230, 235-36 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003).

It was in *Strickland* that the U.S. Supreme Court defined the standard by which an ineffective assistance of counsel claim in a habeas proceeding is to be measured:  petitioner must show that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  In order to establish deficiency, petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed...by the Sixth Amendment."  *Id.*  "To meet the prejudice prong of the *Strickland* test, the defendant may not simply allege but must 'affirmatively prove' prejudice." *Bonvillain v. Blackburn*, 780 F.2d 1248, 1253 (5th Cir. 1986) (citation omitted).  Further, petitioner must not

_____

[19] Mr. Kirksey represented petitioner at trial (along with co-counsel Michael Horan) and on direct appeal.  Petitioner asserts that this dual representation constituted a conflict of interest that caused him prejudice.  Petitioner reasons that "[a] new fresh-attorney could have raised these issues," and that Mr. Kirksey never should have represented him on his direct appeal.  Reply at 8.  However, as discussed *infra*, petitioner cannot show that the outcome of his direct appeal would have been different, had the due process and speedy trial issues been raised.

only prove that the outcome of his trial would have been different "but for counsel's alleged

errors," but must also prove that "'the result of the proceedings was fundamentally unfair or

unreliable.'"  *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995) (*quoting Lockhart v. Fretwell*, 506

U.S. 364, 369 (1993)).   In reviewing the performance of appellate counsel, the two-pronged test

of *Strickland* is likewise applied.  *See Evitts v. Lucey*, 469 U.S. 387, 397-99 (1985), *reh'g denied*,

470 U.S. 1065 (1985); *Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998).

This court's  "scrutiny of counsel's performance must be highly deferential" and it must

"indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance."  *Strickland*, 466 U.S. at 689; *see also Moawad,* 143 F.3d at 946

(observing that the Fifth Circuit "gives great deference to counsel's assistance, strongly presuming

that counsel has exercised reasonable professional judgment") (internal quotations and citations

omitted).  Further, in *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983), the Supreme Court held that

appellate counsel does not have a duty to raise every "colorable" claim on appeal, but rather, has

broad discretion in determining which issues are more likely to be successful.

On appeal, Mr. Kirksey raised thirteen issues on petitioner's behalf.  *See Moody*, 841

So.2d 1067.  Respondents submit that Mr. Kirksey raised the issues he believed to be viable and,

therefore, was not deficient in his representation of petitioner.  Indeed, as discussed above with

respect to Grounds A and C, the due process and speedy trial claims were weak, at best, and it is

likely that Mr. Kirksey believed that pressing the issues would be fruitless.  Thus, even assuming

*arguendo* that petitioner could show that Mr. Kirksey was deficient by failing to raise these

claims, petitioner cannot show prejudice - as he cannot show that the outcome of his direct appeal

would have been different.

Accordingly, the court finds that the Mississippi Supreme Court's decision was not

contrary to, or an unreasonable application of, clearly established federal law, and therefore habeas relief on this claim is denied.

<u>Ground D</u>

In Ground D, petitioner asserts that the trial court erred in allowing the state to call David Moody as a witness when it was aware that he intended to invoke his Fifth Amendment right against self-incrimination.

The record reflects that before David was called to the stand, his attorney stated that David was asserting his Fifth Amendment privilege against self-incrimination, and would do so in response to each and every question that would be asked of him.  The court overruled the motion, advised David of his rights, and then allowed the state to call him as a witness.  The prosecution then asked David: "Mr. Moody, were you with Kenneth Moody on the night of May 4, 1995?"  David's attorney then asserted the Fifth Amendment privilege on behalf of his client and indicated that he would assert the Fifth Amendment on all subsequent questions.  After confirming this with David, the judge dismissed him. Thereafter, petitioner's attorney, Mr. Kirksey, moved for a mistrial, on the basis that allowing the state to question David amounted to the state testifying, which is prohibited.  The motion was overruled.  Mr. Kirksey then asked that David be re-called to the witness stand to allow the defense to question him, which the court allowed.  Mr. Kirksey then asked David: "Mr. Moody, on the night of May 24, 1995, were you with Richard Moody?"  David's attorney again asserted the Fifth Amendment privilege on behalf of his client and indicated that his client would assert the privilege on all subsequent questions.  The trial judge confirmed this with David and then dismissed him again. Tr. 1874-84.

The Fifth Circuit has held that where a trial judge is satisfied that a prospective witness' invocation of the privilege against self-incrimination is well-founded, "it may, *in its discretion*,

decline to permit either party to place the witness on the stand for the purpose of eliciting a claim of privilege or to comment on this circumstance." *U.S. v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975) (emphasis added); *U.S. v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974).

Nevertheless, there are limits to this. In *Douglas v. Alabama*, 380 U.S. 415, 419-20 (1965), the Supreme Court held that a defendant's rights under the Sixth Amendment's Confrontation Clause were violated where the prosecutor read from a witness' written confession and repeatedly asked the witness if he had made various statements, and the witness repeatedly responded by invoking his Fifth Amendment privilege against self-incrimination. The rationale for the Court's holding was that the prosecutor's reading of the statement, and the witness' refusal to answer, were essentially the equivalent of testimony and therefore "the jury might improperly infer both that the statement had been made and that it was true." *Id.* at 419.

As discussed *supra*, the state asked one question of David Moody before he invoked his Fifth Amendment privilege. Defense counsel was permitted to re-call David to the stand and asked him one question before he again invoked his privilege. The court finds that this case falls far short of what occurred in *Douglas*. Moreover, David never testified to anything. *Cf. U.S. v. Ritz*, 548 F.2d 510, 520-21 (5th Cir. 1977) (finding reversible error where a witness was permitted "to take the witness stand and testify up to the point where an anticipated answer to a question posed by the Government would most likely be assumed by the jury to be inculpatory when the taking of the Fifth Amendment by the witness prevented defense counsel from cross examining such witness.").

Thus, the court finds that the Mississippi Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and therefore habeas relief on this claim is denied.

Ground One

In Ground One, petitioner argues that the trial judge committed reversible error during jury

voir dire, when he purportedly confused the directed verdict standard with the presumption of

innocence standard.  Petitioner takes issue with the following statements made by the judge on

day four of voir dire:

> Now, let me pause here parenthetically and go in
> depth with you a little bit more about the presumption
> of innocence.  Do all of you understand, as he sits
> there now, this defendant is presumed innocent?
>
> (Jurors nod affirmatively)
>
> Okay.  That presumption attends him and follows him
> throughout the course of the trial unless and until it is
> overcome by the State of Mississippi.  Now, if it is not,
> you will not have to worry about it because the Court
> will rule on that.  But even though there is the
> presumption of innocence, if at any point during the
> course of the trial the states [*sic*] overcomes that
> presumption of innocence, then from that point on that
> presumption of innocence no longer attends the defendant.

Tr. 791.

Petitioner argues that the statements made by the judge left the jury with the impression

that if the judge did not take the case from the jury (by means of a directed verdict) then the state,

in the judge's opinion, had overcome the presumption of innocence.  *See* Memo at 17.  In

rejecting this argument on petitioner's direct appeal,[20] the Mississippi Supreme Court indicated

that any possible error was cured, taking into account the timing of the comments[21] and the fact

---

[20] Although the court addressed the merits of the issue, it pointed out that, technically, the
issue was procedurally barred from review on appeal because no contemporaneous objection had
been made. *Moody*, 841 So. 2d at 1075-76.

[21] With respect to the timing of the comments, the court stated as follows:

that the jury was properly instructed as to the law on the presumption of innocence and burden of

proof in Instructions C-3 and C4.[22]  *See Moody*, 841 So. 2d at 1075-76.

In addressing allegedly prejudicial comments made by a trial judge during voir dire, the

Fifth Circuit has stated:

> [O]ur role is to determine whether the judge's behavior
> was so prejudicial that it denied the defendant a fair, as
> opposed to a perfect, trial.  To rise to the level of a
> constitutional error, the ... judge's actions, viewed as a
> whole, must amount to an intervention that could have
> led the jury to a predisposition of guilt by improperly
> confusing the functions of judge and prosecutor.  The
> judge's intervention in the proceedings must be
> quantitatively and qualitatively substantial to meet this
> test.

*Evans v. Cockrell*, 285 F.3d 370, 376 (5th Cir. 2002) (*quoting U.S. v. Bermea*, 30 F.3d 1539, 1569

(5th Cir. 1994)) (brackets and ellipses in original).  Thus, "the context of the remarks, to whom

the remarks were directed, the number and nature of the remarks, and the presence of curative

instructions" must be reviewed in determining whether the judge's remarks were prejudicial.  *Id.*

(*citing U.S. v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998)).

---

> Finally, on this issue, we must also remember that
> these objectionable comments were made during the
> fourth day of voir dire on March 29, 2001.  We can
> be certain that when these jurors retired to deliberate
> on April 12, 2001, some fifteen (15) days and 1,780
> pages of trial transcript later, after being fully questioned
> on voir dire, after hearing all of the evidence, and after
> receiving the jury instructions and hearing closing
> arguments of counsel, their verdicts were not in any way
> affected by this one comment made by the trial judge
> during voir dire.

*Moody*, 841 So. 2d at 1076.

[22] In addition, two other instructions addressing the presumption of innocence were given
to the jury prior to the commencement of deliberations.  SCR 226-28, 233.

24

This court agrees with the Mississippi Supreme Court that the remarks by the trial judge do not rise to the level of constitutional error.  A reading of the court's entire voir dire on the presumption of innocence, the burden of proof placed on the state, and the jury's responsibilities once it got the case for deliberation, as well as the instructions given to the jury before they began deliberations, demonstrates that the jury was properly instructed.  *See*, *e.g.*, Tr. 433-1427; *see also* SCR 206-48, 276-79.  As the Mississippi Supreme Court noted in its opinion, and as both sides conceded in their appellate briefs,"[i]t is presumed that the jury follows the judge's instructions." *Moody*, 841 So. 2d at 1076 (*citing Davis v. State*, 660 So. 2d 1228, 1253 (Miss. 1995); *Walker v. State*, 671 So.2d 581, 618 (Miss. 1995)); *see also U.S. v. Posada-Rios*, 158 F.3d 832, 872-73 (holding that any prejudice to defendants resulting from instruction during voir dire regarding effect of witness' guilty plea was cured by district court's later instructions); *U.S. v. Munoz*, 150 F.3d 401, 413 (5th Cir. 1998) (any prejudice caused by judge's statement about defendant's prior conviction during voir dire was remedied by curative instruction to jury at end of trial).

Accordingly, the court finds that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and habeas relief on this claim is hereby denied.

Ground Two

In Ground Two, petitioner argues that the jury was tainted by pre-trial publicity and therefore he was denied his right to a fair trial.  Specifically, petitioner claims that the trial judge erred by failing to admonish the venire not to watch television or read newspaper accounts of the trial during the overnight recess, and as a result, some of the potential jurors did in fact see both television and newspaper accounts regarding petitioner's case.  *See* Petition at 6; Memo at 18-19.

The record reveals (and the Mississippi Supreme Court acknowledged) that the trial judge

failed to admonish the jury venire at the end of the first day of voir dire not to talk about the case or watch television reports regarding it. *Moody*, 841 So.2d at 1076.  The next day, petitioner's attorney moved to strike the entire jury venire,[23] on the basis that on the previous evening there had been extensive media television coverage of the case on at least one, and possibly two, Gulf Coast television stations.  Following petitioner's motion, the judge asked how many of the potential jurors had been exposed to media coverage and at that point, he elected to question the jurors individually about their exposure to media coverage. Tr. 429-33; *see also id.* at 674.  The jurors who indicated they had been exposed to media coverage were then individually questioned by the court and the attorneys, over a two and a half day period.[24]  *See id.* at 433-767.

During individual voir dire, the questions consisted generally of the following: "Based on what you have read or heard, or based on whatever you have heard, even if it was verbal, have you formed an opinion in this case?"  "Do you feel like you can be fair and impartial?" "If you heard something different in the testimony that came out during the trial, would you be more inclined to believe what came out here at trial and rely on that or what you heard on TV?" "If I instructed you that is all hearsay and your duty as a juror would be to totally put that out of your mind, could you do that?" "Could you listen to the testimony, receive the evidence and that coupled with the instructions of law arrive at a verdict that could be fair and impartial to both sides; could you do that?" *See*, *e.g.*, Tr. 434-35, 441-42, 455, 505-06.  After the court asked general questions, both

---

[23] The court notes that petitioner's attorney moved to strike the venire and/or for a mistrial multiple times during the process of voir dire, both on the basis of pre-trial publicity and information that jurors allegedly learned about the defendant from each other and from others at the courthouse.  *See*, *e.g.*, Tr. 341, 429-30, 432, 456-57, 489, 494-95, 532-33, 568-69, 577-78, 645-46, 826, 1387-88.

[24] Petitioner originally had requested that all voir dire be conducted individually.  *See* SCR 101-08.  The parties then agreed that individual voir dire would be conducted only regarding pretrial media exposure and death penalty qualification.  *See id.* at 140-43.

the defense and prosecution were permitted to ask more specific questions regarding the impact of publicity or the impact of discussions about the case that had allegedly occurred among the venire. After each juror was individually questioned, they were instructed not to discuss the questions with anyone.  *See*, *e.g.*, *id.* at 444, 449, 453, 456, 653.

During voir dire, petitioner's attorney again moved for a mistrial when it was revealed that there had been some discussion of the case among jurors in the hallway. Tr. 456.[25]  The judge overruled the motion and continued to individually question the jury panel.  *Id.* at 457-58.  The judge began asking individual jurors if they had heard anything from their fellow jurors or anybody else about the defendant himself.  *See*, *e.g.*, *id.* at 462, 465, 474, 484.  He also asked the jurors collectively if they had heard anything about the defendant personally, whether it was from their fellow jurors or from anyone else.  *Id.* at 485-86; *see also id.* at 675.  The judge repeatedly instructed the jurors during the voir dire process that they were forbidden from viewing anything or talking with anybody about the case.  *Id.* at 486-88, 490, 522-23, 634, 662-63, 688-89, 691-92, 767, 919, 921, 1060, 1103, 1208, 1419.  The judge repeatedly asked the jurors whether they had spoken with anyone about the case or seen any media coverage about the case and any jurors who indicated that they had were questioned about it.  *See*, *e.g.*, Tr. 633, 766, 916-17, 1003, 1009, 1017-18, 1101, 1340-41, 1388, 1464-65.

In *Patton v. Yount*, 467 U.S. 1025, 1031 (1984), a habeas case involving claims of juror

---

[25] Petitioner asserts that the information the jurors learned through discussions with each other and from the media included evidence that was not going to be admitted at trial, such as evidence that he used a water hose to kill one of the victims, that he had committed other murders, and that his cousin had participated in the crimes and/or was going to testify against him. Memo at 21; *see also, e.g.*, Tr. 456, 509, 524, 532, 755-56, 762.  One of the prospective jurors (who was excused) stated that before the judge admonished the jurors not to talk about the case, it was "common talk at the bathroom...about the crime and what ought to be done to [petitioner]."  Tr. 609.

bias from pre-trial publicity, the U.S. Supreme Court recognized that a trial judge's

determinations regarding venire members' bias are essentially factual determinations entitled to

deference on collateral review.  Defining the pertinent question as being: "did a juror swear that

he could set aside any opinion he might hold and decide the case on the evidence, and should the

juror's protestation of impartiality have been believed," the *Patton* Court noted that "[t]here are,

of course, factual and legal questions to be considered in deciding whether a juror is qualified.

The constitutional standard that a juror is impartial only if he can lay aside his opinion and render

a verdict based on the evidence presented in court is a question of federal law; whether a juror can

in fact do that is a determination to which habeas courts owe special deference."  *Id.* at 1025,

1036-37 & n.12.

      The Supreme Court reiterated the *Patton* holding that state-court findings of fact are

clothed with the presumption of correctness in *Wainwright v. Witt,* a habeas case which addressed

dismissals of potential jurors for cause in a death penalty case:

> Last term, in *Patton*...we held that a trial judge's finding
> that a particular venireman was not biased and therefore
> was properly seated was a finding of fact subject to
> [28 U.S.C.] § 2254(d).  We noted that the question
> whether a venireman is biased has traditionally been
> determined through *voir dire* culminating in a finding by
> the trial judge concerning the venireman's state of mind.
> We also noted that such a finding is based upon
> determinations of demeanor and credibility that are
> peculiarly within a trial judge's province.  Such
> determinations were entitled to deference even on direct
> review; '[t]he respect paid such findings in a habeas
> proceeding certainly should be no less.'

469 U.S. 412, 428 (1985) (quoting *Patton,* 467 U.S. at 1038); *see also Mu'Min v. Virginia*, 500

U.S. 415, 427, 428 (1991), *reh'g denied*, 501 U.S. 1269 (1991) (stating that trial courts should be

granted wide discretion "in conducting voir dire in the area of pretrial publicity and in other areas

of inquiry that might tend to show juror bias" and that "[a] trial court's findings of juror impartiality may be overturned only for manifest error.") (citations omitted).

In reviewing the issue on appeal, the Mississippi Supreme Court noted the trial court's extensive voir dire over a seven-day period (two and a half days of which related specifically to pre-trial publicity). *Moody*, 841 So. 2d at 1077; *see also* SCR 191-97; Tr. 433-1427. As discussed above, during this process, any juror who had been exposed to pretrial publicity or had even the slightest hint of outside knowledge of the case was individually questioned. *See* Tr. 433-767. This voir dire process resulted in the dismissal of numerous jurors for cause (on the basis of either their exposure to pre-trial publicity, their views about the death penalty, or myriad other reasons) when the judge determined those jurors could not be fair and impartial. *See Moody*, 841 So. 2d at 1077; *see generally* Tr. 433-1427. The voir dire process was "by no means perfunctory." *Mu'Min*, 500 U.S. at 431.

As the Mississippi Supreme Court noted, the jury selection process resulted in the seating of only two jurors who had any knowledge of the case - Johnny Jefferson and Shellie O'Keefe - and both of them indicated that they could be impartial. *Moody*, 841 So. 2d at 1077. The individual voir dire of Mr. Jefferson revealed nothing prejudicial: Mr. Jefferson stated on the record that he read an article and saw a segment on the news about the case, that he recognized one of petitioner's attorneys from television, and that he had no knowledge of specific facts about the case. Tr. 625-27. The individual voir dire of Ms. O'Keefe also revealed nothing prejudicial: Ms. O'Keefe revealed that she had heard some facts about the case but did not know the names of the persons involved.[26] *See Mu'Min*, 500 U.S. at 430 (stating that in order to have a fair trial, "[i]t

---

[26] Ms. O'Keefe reported that she had spoken to others in the jury panel about the case: "I heard that there had been two murders, and that two gentlemen were involved – something about being cousins. I don't know if the two people that were killed were cousins or the two people

is not required that the jurors be totally ignorant of the facts and issues involved.") (*quoting Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  Ms. O'Keefe also testified that she harbored no prejudice or ill-will against petitioner, that she had not formed an opinion about the case and could be fair and impartial, and Mr. Jefferson similarly testified that he could be fair and impartial.  *Id.* at 627, 753-60.[27]  Petitioner has offered no evidence suggesting that these jurors' answers were false.  *See Green v. Quarterman*, 213 Fed. Appx. 279, 281 (5th Cir. Jan. 8, 2007).

Ultimately, relying in part on *Mu'Min*, the Court found that petitioner had not demonstrated "that he was 'seriously or irreparably' damaged by the vague details the two jury members had heard."  *Moody*, 841 So. 2d at 1078.   This court finds that the Mississippi Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law and therefore habeas relief on this ground is denied.


Ground Three

In Ground Three, petitioner argues that he was unfairly denied use of his peremptory challenges, in that he was forced to use ten of his nineteen peremptory challenges to strike jurors with outside knowledge of his case in order to achieve a fair and impartial jury, because not enough challenges for cause were granted.  *See* Petition at 6; Memo at 25-27.

---

that killed the other two people were cousins; that there was a woman involved, that she was raped – something about something about with a pipe down her throat or something, and that's all I heard.  Tr. 753, 755-56, 758-60.

[27] The court notes that petitioner and his attorney accepted both Mr. Jefferson and Ms. O'Keefe as jurors even though there were peremptory strikes available to petitioner at the time.  *See* Tr. 1433, 1435.  It is also worth noting that at the conclusion of jury selection, the judge asked petitioner to confirm that he had participated in jury selection, and also asked him if he was satisfied with the selection of the jury, as well as with his attorney's representation, to which he responded "[y]es".  *Id.* at 1443-44.

The record reveals that only one challenge for cause was made by petitioner - of prospective juror Mr. Moran.  Tr. 1427.   However, after the judge denied this challenge for cause, petitioner used a peremptory challenge to strike Mr. Moran and Mr. Moran did not sit on the jury.[28]  *See id.* at 1432, 1439.  Thus, any claim of an impartial jury based on Mr. Moran has no merit.  *See Ross v. Oklahoma*, 487 U.S. 81, 85-86 (1988), *reh'g denied*, 487 U.S. 1250 (1988) (claim of impartial jury could not focus on prospective juror (for whom challenge for cause was denied) because he did not actually sit on the jury:  "Petitioner exercised a peremptory challenge to remove [challenged juror], and [he] was thereby removed from the jury as effectively as if the trial court had excused him for cause.").

In addition, the U.S. Supreme Court has held that "because peremptory challenges are a creature of statute and are not required by the Constitution,...it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise."  *Ross*, 487 U.S. at 89 (citations omitted).  "As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides."  *Id.*   The Mississippi Supreme Court determined from the record that both petitioner and the state received more peremptory challenges than that to which they were entitled - twenty-one instead of fourteen.  *Moody*, 841 So. 2d at 1079; *see* Tr. 1428-39 (each side received nineteen for the jury plus an additional strike for each alternate).[29]   The fact that petitioner had to use

---

[28] Indeed, after denying petitioner's challenge for cause, the trial judge gave each side an extra peremptory strike (for a total of 19) specifically because of Mr. Moran.  *See* Tr. 1422-29.

[29] Mississippi law provides that in cases where the punishment may be death or life imprisonment, the prosecution and the defendant shall each have twelve peremptory challenges for selecting the twelve regular jurors.  *See* Rule 10.01 of the Uniform Circuit and County Court Rules (the "UCCCR").  That rule further provides that the court may, in its discretion, direct that alternate jurors be selected - and in death penalty cases, the number of peremptory challenges shall equal the number of alternate jurors being selected.  *Id.*  Thus, petitioner and the state were

peremptory challenges to strike jurors with knowledge of the case in an effort to have an impartial jury does not alter the analysis: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Ross*, 487 U.S. at 88 (citations omitted).  Moreover, as noted *supra*, a juror is not required to be completely ignorant of the facts and issues in the case.  *See*, *e.g.*, *Johnson v. State*, 666 So. 2d 784, 794 (Miss. 1995), *overruled on other grounds by Hennington v. State*, 702 So. 2d 403 (Miss. 1997) (citation omitted).

Accordingly, the court finds that the Mississippi Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and therefore habeas relief must be denied as to this claim.

Ground Four

In Ground Four, petitioner claims that juror misconduct tainted the jury pool.  Specifically, petitioner argues that his jury was "self-selected" in that they knew what to say if they wanted to either stay on the jury or be excused, and that there was evidence that jurors were discussing his case among themselves and lied under oath[30] when questioned about this.  *See* Petition at 6; Memo at 27-30.

In order to obtain a reversal of a conviction on the ground that a juror lied or concealed information, petitioner "must demonstrate that the juror was actually biased or fundamentally incompetent."  *U.S. v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001).  "Actual bias exists when a juror fails to answer a material question accurately because he is biased."  *Id.* (citation omitted).

_____

each entitled to fourteen strikes.

[30] The record reflects that all the jurors were placed under oath before voir dire began. *See*, *e.g.*, Tr. 424, 431; *see also Moody*, 841 So. 2d at 1081 n.11.

Inaccurate responses to questions do not always constitute bias.  Indeed, "[e]ven when a juror's non-disclosure is dishonest as opposed to mistaken, his behavior is not a basis for reversal unless the dishonesty appears to be rooted in bias or prejudice."  *Id.* (citation omitted).

In support of his argument, petitioner cites to the voir dire of Anthony Kalberg, who stated that he and several other jurors (four or five) had discussed the case before they were told not to by the judge.  Mr. Kalberg identified one of the jurors involved in that discussion as "a tall, dark-haired gentlemen [sic] who is in the National Guard and is about to be sent to Bosnia."  Tr. at 549-53.  Later, prospective juror Frankie Moran stated that he was in the National Guard and would be going to Bosnia later that year.  Mr. Kirksey then asked Mr. Moran if he had spoken with any of the other jurors regarding the case, and Mr. Moran said no.  *Id.* at 652-53.  The judge allowed petitioner's attorney to question Mr. Moran again about this, at which time Mr. Moran admitted that he was in the bathroom during the discussion, but that he had not heard anything that would cause him to form an opinion one way or the other.  *Id.* at 1292-93, 1350-51.  At any rate, Mr. Moran did not sit on the jury, as petitioner used an extra peremptory strike against him.  *See id.* at 1432, 1439.  In addition, Mr. Kalberg testified that all of the jurors with whom he had discussed the case were in the group of jurors who had indicated that they had seen or heard information about the case.  *Id.* at 551-52.  Thus, these jurors would have been questioned individually about their exposure to outside information about the case.[31]

Petitioner also points to the voir dire of prospective juror Joy Raymond, who stated that she had friends who knew one of the victims - Robbie Bond - and that she had spoken with her friends about what happened and had formed an opinion in the case.  The judge excused Ms.

_____

[31] One of these jurors was William Crowell, who testified that he had heard five men (whom he could not identify) talking about the case while waiting to use the bathroom.  Tr. 608-10.  Mr. Crowell was excused.  *Id.* at 608.

Raymond.  Petitioner's attorney then questioned Ms. Raymond about whether she had spoken

with any of the other jurors:

> Q: Did the people that you have been with there in the back, did you tell
> anything to them about what you knew or your discussions in knowing Ms. Bond?
> A: Only one person. I've got to be honest, one person.
> Q: Yes, ma'am. And which one was that?
> A: Cantrell.

Ms. Raymond then stated that she had talked to two other girls also, but that she

"didn't go into detail with them" as she did with Mr. Cantrell.  Mr. Cantrell was then questioned

and he admitted that he had spoken with Ms. Raymond.  The judge excused Mr. Cantrell.  The

remaining group of jurors with whom Ms. Raymond had been sitting was questioned as a whole

as to whether they had heard anything Ms. Raymond said, but no one responded that they had.  Tr.

694-98.

The record also reveals that during voir dire the court was notified by the bailiff that

certain excused jurors were returning to the gathering of prospective jurors and informing them

"as to 'what to say to get off the jury.'"  Tr. 567; *see also Moody*, 841 So. 2d at 1080.  This was

happening despite the fact that after jurors were excused, they were sent out a separate exit in

order to prevent them from "commingling with the other jurors."  As soon as this was brought to

the court's attention, the court ordered that all excused jurors were to be placed in the grand jury

room rather than immediately allowed to leave the courthouse, and a bailiff was to be stationed

there.  Tr. 569-71.

As noted *supra*, trial courts have wide discretion "in conducting voir dire in the area of

pretrial publicity and in other areas of inquiry that might tend to show juror bias" and "[a] trial

court's findings of juror impartiality may be overturned only for manifest error."  *Mu'Min v.

Virginia*, 500 U.S. 415, 427, 428 (1991), *reh'g denied*, 501 U.S. 1269 (1991).  Moreover, this

34

court has already found that the jury selection process in this case was comprehensive and that it resulted in the seating of only two jurors who had knowledge about the case, both of whom indicated they could be impartial.  The Mississippi Supreme Court rejected petitioner's assignment of error, stating: "Upon consideration of the applicable case law ..., and upon review of the record on this issue, there is no revelation of juror conduct rising to a level of fraud or prejudice."  *Moody*, 841 So. 2d at 1081.  This court agrees, finding that the Mississippi Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  Therefore, habeas relief on this claim is denied.

Ground Five

In Ground Five, petitioner argues two things: first, that he was prejudiced by remarks made by a bailiff within the hearing of a prospective juror (who was eventually selected as a member of the petit jury); and second, that he was denied his right to a fair trial when two uniformed officers led him into the courtroom in the jury's presence and sat beside him.  *See* Petition at 6-7; Memo at 31-34.

The record reflects that during voir dire, one of the then-prospective jurors, Anita Bland, told the court that she had been sitting in the back row, and that one of the guards "asked if the ladies in the back, if they had the door covered in the back."  When asked if she had drawn any inference from that remark, Ms. Bland stated: "I assumed that in case if something happened, he tried to get out of the room, that is what I assumed from that."  Ms. Bland then explained:  "I pretty much knew why they were there anyway...I knew that you would have to have security."  She went on to state that "I would think a capital murder case, you would have to have security," and that she would have assumed that anyone accused of capital murder would be incarcerated pending trial, regardless of the comment she overheard.  Ms. Bland then stated that the statement

35

did not affect her, that she would totally disregard it, that she had not formed an opinion in the

case, and that she could arrive at a fair verdict by listening to the evidence and the instructions on

the law.  Petitioner's attorney immediately moved for a mistrial after Ms. Bland was questioned,

which was denied by the court.  Tr. 490-95.

Petitioner argues "that the comment painted [him] in the most unfavorable light," as "[a]

dangerous man who had to be caged."  Memo at 31.  However, the Supreme Court made the

following finding after considering the totality of Ms. Bland's sworn testimony:

> [I]t is abundantly clear that Bland well expected extra
> security in the case, not because of any suspected
> dangerous propensities on the part of Moody, but
> because of the general nature of the case - a capital
> murder case.  She assumed Moody was incarcerated,
> not because he was a flight risk, but because he was
> charged with capital murder - a crime punishable by
> death.  In the end, Bland was definite in her responses
> to questions that she would not be influenced by the
> remarks of the bailiff/guard, that she could disregard
> any negative inferences which could be drawn for what
> had occurred, that she understood that Moody was
> presumed innocent and that the State had the burden
> of proving his guilt beyond a reasonable doubt, and that
> she could be a fair and impartial juror by deciding the
> case based on the evidence presented in open court and
> the law as given by the court.

*Moody*, 841 So. 2d at 1082.

As stated *supra*, a trial court is granted "wide discretion" in conducting voir dire into

"areas of inquiry that might tend to show juror bias."  *Mu'Min*, 500 U.S. at 427.  Further, "[a] trial

court's findings of juror impartiality may be overturned only for 'manifest error.'"  *Id.* at 428

(citations omitted).  Petitioner has not made such a showing.[32]

---

[32] Moreover, it is worth noting that petitioner's attorney did not challenge Ms. Bland for
cause.  Indeed, he accepted Ms. Bland as a juror even though there were peremptory strikes
available to petitioner at the time.  *See* Tr. 1425-27, 1432.

Petitioner's second contention of prejudice relates to the amount of security involved in the courtroom.  Petitioner asserts that he was denied his right to a fair trial when two uniformed officers led him into the courtroom in the presence of the jury and one sat beside him and one sat to his side.  Memo at 34; *see also* Tr. 1937.  Petitioner argues that the number of officers present in the courtroom prejudiced him because it gave the jury "an unnecessarily harsh perception of him."

The Fifth Circuit addressed a similar situation in *U.S. v. Diecidue*, 603 F.2d 535, 549 (5th Cir. 1979), in which the defendants filed several motions for a mistrial based on the jury observing them flanked by marshals and in handcuffs and shackles.  The court stated that "brief and inadvertent exposure to jurors of defendants in handcuffs is not inherently prejudicial as to require a mistrial and defendants bear the burden of affirmatively demonstrating prejudice."  *Id.* In rejecting defendants' appeal, the court stated that "[t]he conditions under which defendants were seen [on one occasion, flanked by non-uniformed U.S. Marshals, and on another occasion, handcuffed] were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial."  *Id.  See also Holbrook v. Flynn*, 475 U.S. 560, 572 (1986) ("[W]hen reviewing a constitutional challenge to a state-court proceeding...[a]ll a federal court may do in such a situation is to look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an acceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.").

In the case *sub judice*, as soon as petitioner complained about the security officers escorting him into the courtroom in front of the jury, the judge instructed the bailiff not to let that happen again and to always bring petitioner into the courtroom before the jury was brought in.

*See* Tr. 1937, 1948.  This is the only incident of allegedly excessive security of which petitioner complains.  Petitioner does not allege that the jury ever saw him in shackles - or even in handcuffs.  And after this incident, the judge cautioned the bailiff to "always make sure that there's no chance that the jury is exposed to [petitioner] behind bars or anything of that nature, seeing him in shackles or –."[33]  *Id.* at 1453.

Accordingly, for the foregoing reasons, the court finds that the Mississippi Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and therefore habeas relief on this claim is denied.

Ground Six

In Ground Six, petitioner argues that the trial court erred in failing to suppress his May 18, 1995 confession.  Petitioner argues that the confession was not voluntary because it was given in exchange for a promise by law enforcement to exercise leniency with his cousin Richard Moody, who had also been arrested.  *See* Petition at 7; Memo at 34-35.

The Supreme Court has set forth the analysis to be undertaken in determining whether a defendant has knowingly and voluntarily waived his *Miranda* rights:

> [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.

*Fare v. Michael C.*, 442 U.S. 707, 724-75 (1979), *reh'g denied*, 444 U.S. 887 (1979) (*citing*

*Miranda v. Arizona*, 384 U.S. 436, 475-77 (1966)).

---

[33] Indeed, petitioner's pre-trial motion to preclude shackles and limit the number of security officers had been granted by the judge.  SCR 44-45, 141-42.

After reviewing the record, the Mississippi Supreme Court made the following findings of fact:  that petitioner was interviewed in the presence of four law enforcement officials, was read his rights, appeared to understand those rights, and thereafter  signed the 'waiver of rights' form.[34] The court found nothing in the record indicating that petitioner was threatened or promised anything in exchange for his confession nor was there anything in the record "which contains the slightest inference that Richard, Moody's cousin, was being held to induce a confession."  In considering the totality of the circumstances, the court found that Moody initially denied any involvement in the murders but subsequently instigated the conversation about Richard.  Moody told law enforcement officials that Richard had nothing to do with the crimes and that "[y]a'll need to let him go and then I'll talk."  Master Sergeant Fortinberry responded by stating that '[w]ell, you need to tell us about it and then ... [i]f he ain't got nothin to do with it, we'll cut him loose, if he wasn't involved Sunday night with ... these two."[35]  *Moody*, 841 So. 2d at 1083-84.

The Court further found that the trial court had conducted the requisite evidentiary hearing after the state made out a prima facie case as to the voluntariness of the confession[36] and that the trial court was correct in its determination that the state had proven the voluntariness of

---

[34] In addition, the Mississippi Supreme Court noted that "even though Moody stated he could "read and write good," Lt. Pickens still read the rights to petitioner, stopping each time to ask him if he understood that particular right, and he explained the waiver of rights to petitioner before petitioner read it and signed it.  *Moody*, 841 So. 2d at 1083.  The court further found that "Moody obviously understood these rights because after giving certain incriminating statements, he stated 'You said I could stop at any time. I'm ready to stop.'"  *Id.* at 1083 n.15.

[35] With respect to this statement, the Court stated: "The only thing M/Sgt. Fortinberry told Moody was that Moody needed to tell them what happened and 'if' Richard didn't have any involvement in the crimes, they would free him.  This is what the citizens would expect from responsible law enforcement officials...In other words, once the investigation was completed, if it were determined that Richard had no involvement in the crimes, he would be released regardless of whether Moody gave a confession."  *Moody*, 841 So. 2d at 1085.

[36] *See Abram v. State*, 606 So. 2d 1015 (Miss. 1992), *overruled on other grounds by Foster v. State*, 961 So. 2d 670 (Miss. 2007).

petitioner's confession beyond a reasonable doubt based on the totality of the circumstances. *Moody*, 841 So. 2d at 1085-86; *see also* Tr. 57-93, 111-42, 149-200.  Judge McKenzie's order overrruling the motion to suppress reflects that at the suppression hearing, the judge heard the audiotaped recording of the confession, as well as testimony from all the officers present at the confession, and concluded that "based upon the totality of the circumstances...[the confession] was knowingly, intelligently, and voluntarily given without any treats, promises, or offers of reward" and that it was therefore admissible at trial.  SCR 147-48.

As noted above, the trial court is required to consider the totality of the circumstances to decide whether a statement should be suppressed.  The record is clear that the trial court did so and the Mississippi Supreme Court did not disagree.  *Moody*, 841 So.2d at 1086.  The court finds that the state courts' decisions regarding petitioner's confessions are not contrary to, or an unreasonable application of, clearly established federal law.

Moreover, "while the ultimate issue of voluntariness [of a confession] is a legal question requiring independent factual determination, subsidiary factual questions ... are entitled to the § 2254(d) presumption."  *Gachot v. Stalder*, 298 F.3d 414, 418 (5th Cir. 2002) (ellipses in original) (citation omitted).  "With regard to questions of fact, § 2254(e)(1) requires federal courts to presume that the factual findings of the state courts are correct unless the petitioner 'rebut[s] the presumption of correctness by clear and convincing evidence.'"  *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003) (brackets in original); *see also Pruett v. Thigpen*, 665 F.Supp. 1254, 1268 (N.D. Miss. 1986), *aff'd*, 805 F.2d 1032 (5th Cir. 1986) (where both the trial and appellate court had found confessions voluntary, stating that "[a] state court's finding that a defendant's confession was voluntary precludes federal habeas relief unless it can be found that the state record did not fairly support the finding of voluntariness.") (citations

omitted).  Petitioner has failed to produce clear and convincing evidence to overcome the

presumption of correctness accorded to the state courts' findings that petitioner's confession was

not coerced.

For the reasons set forth above, habeas relief as to this claim must be denied .

Ground Seven

In Ground Seven, petitioner argues that he was denied one of his major defense arguments

(that Richard Moody had committed the murders) by the trial judge participating in and permitting

the state to rehabilitate the testimony of Lieutenant Sam Pickens outside the presence of the jury,

after Pickens confused Richard Moody with David Moody during redirect examination.  *See*

Petition at 7-8; Memo at 35-36.

In *U.S. v. Jacquillon*, 469 F.2d 380, 387 (5th Cir. 1972), the Fifth Circuit described the

role of a trial judge as follows:

> [T]he trial judge is not relegated to silence during a trial.
> He is more than a mere moderator; he is the governor
> of the trial process, vested with the duty to insure that
> the law is properly administered.  In fulfilling this
> obligation, he may question witnesses and comment on
> the evidence.  He must be careful, however, that his
> interventions are timely, designed to prevent
> misunderstanding, and not prejudicial to the accused.
> Furthermore, his participation must not violate the basic
> principle that in our system of justice the judicial and
> prosecutorial functions are separate and distinct and are
> not to be merged.

(internal citations omitted).

The trial record in this case reflects that on cross-examination, the defense asked Lt.

Pickens how many people were arrested for the murders of Hatcher and Bond, and Lt. Pickens

initially indicated that three suspects were taken into custody.  On redirect examination by the

prosecution, Lt. Pickens testified that two people had been arrested for the crimes and then the

following exchange took place:

> Q: Are you aware of any evidence that indicates any involvement by Richard Moody?  In your own mind as a criminal investigator, is there a piece of evidence that links Richard Moody to the crime that occurred on that bridge and at that trailer?
> A: Yes, sir.
> Q: What is that?
> Mr. Kirksey: Your Honor, you can't impeach your own witness. He just answered the question.
> The Court: Well, he said yes, sir.  I guess he'll allow him to answer it. Didn't you ask him a follow-up question, Mr. Price?
> Mr. Price: Yes, sir.
> The Court: You may answer it.
> A: Yes, sir. As to what linked it?
> Q: Is he a suspect in this crime?
> A: Yes, sir.
> Q: He was at the time, you're telling me?
> A: Yes, sir.
> Q: Okay. Today is he a suspect in this case in your mind?
> A: Yes, sir.
> Q: Because of what? I think we're miscommunicating.
> A: I'm trying to stay away from —
> Q: Just tell me how that - I mean, I want the jury –
> The Court: That may be something we need to develop outside the presence of the jury and then bring them back in.
> Mr. Price: Judge, I can clear it up with him right here.
> The Court: Well –
> Mr. Price: I do. May I just ask him one question?

The judge, without allowing the state to ask another question, decided to exclude the jury.

Outside the presence of the jury, the court established that Lt. Pickens had confused David Moody with Richard Moody.  The judge then asked the state how it intended to clear up the miscommunication and the following exchange took place:

> Mr. Price: I'm going to ask him... – was Richard Moody charged with this crime and does he believe Richard Moody had anything to do with this crime.
> Mr. Kirksey: Your Honor, to which I'd object.  What this amounts to is coaching his own witness outside the presence of the jury, when the jury has already heard him say three times that Richard Moody was a suspect.
> The Court: I would normally agree with you, but I can take the blame here because I'm the one - though it is highly unusual to do so, I'm the one that admonished these witnesses not to say anything about David Moody, and it's my understanding that this witness had that confusion with that, and that's why he was reluctant as he was.  Now, I don't know

how to cure it in front of the jury.

Tr. 1747-52.

A brief exchange continued between the defense attorney and the court and then the prosecutor pointed out that had he been permitted to ask one more question before the judge sent the jury out, the state could have cleared up the confusion, and that it was unfair to the state for the judge to send the jury out during the miscommunication.  The judge again asked how the state intended to clear up the confusion and Mr. Price stated "[w]hen the jury comes back in and sits in the box, I say, Deputy Pickens, was Richard Moody charged in this case with a crime? No, sir. Why not? Because we didn't have any evidence against –"  The judge then cut the prosecutor off and noted that he was telling his witness how to testify.  When testimony resumed before the jury, the state was allowed to rehabilitate the witness as follows :

> Q: Deputy Pickens, before the break we were talking about Richard Moody.
> A: Yes, sir.
> Q: Were you confused about who Richard Moody is?
> A: Yes, sir.
> Q: Okay.  Now, I'm going to go back and ask you, was he arrested the same day as Kenneth?
> A: Yes, sir, he was taken into custody.
> Q: Okay, now, did he have anything to do with this crime that we're here trying today?
> Mr. Kirksey: To which I'm going to object, Your Honor, for all the reasons I stated outside the presence of the jury.
> The Court: All right. I'm going to overrule, and though procedurally it is highly irregular, if you want to ask some questions based on that, I'll allow you to do so, even though it is highly unusual procedure-wise.

Tr. 1752-54.

Thereafter, Mr. Kirksey moved for a mistrial, indicating that he believed the judge was assisting the state and was allowing the prosecution to rehabilitate the witness after a break during which they had gone over the witness' testimony.  Tr. 1755-58.  The state supreme court held as follows:

In the cross-examination of Lt. Pickens, and throughout
the entire trial, the trial judge exercised the utmost caution
and in no way appeared to be trying the prosecution's
case ... It is abundantly clear from the record that the trial
judge was not attempting to aid the prosecution, but
instead was attempting to assure compliance with his
prior admonishment, which was more beneficial to Moody
than to the State, and now he's being criticized by Moody.
This Court can understand that since Moody was
presenting a theory that Richard possibly committed these
crimes and a State's witness had obviously gotten confused
in the proper identification of one of the Moodys, counsel
for Moody would want the State's witness to remain
confused since he was suddenly implicating Richard as
being involved in the murders of Bond and Hatcher.  With
the dynamics of a trial, and based on our rules of procedure
and rules of evidence, the trial judge would never want to
knowingly declare a recess in a civil or criminal trial at a
point in the trial where counsel would have the opportunity
to clandestinely 'coach' a witness concerning testimony.
But again, the record reveals that the trial judge's declaration
of a recess during Lt. Pickens' testimony was met with
disfavor by not only defense counsel, but also the prosecutor....

* * *

Again, turning to the record before this Court in the case *sub
judice*, there is nothing which occurred outside the presence
of the jury or in the presence of the jury which even remotely
begins to rise to the level of the improper conduct causing
reversal in the other cases discussed.[37]  This issue is without
merit.

---

[37] Petitioner cited *West v. State*, 519 So. 2d 418, 419-20 (Miss. 1988), in which the court
reversed a murder conviction because the judge had improperly and/or unnecessarily interjected
himself into the proceedings some thirty (30) times, including instructing the prosecution on
what questions to ask of witnesses during cross-examination and asking questions directly of
witnesses where the prosecution's questions were ineffective.  The state cited *Jasper v. State*, 759
So. 2d 1136 (Miss. 1999), where the judge told a witness that he wanted the witness to take more
time to think about his answer before giving it.  In *Jasper*, the Supreme Court looked with
disfavor on the actions of the trial judge but found no reversible error because, as in the case *sub
judice*, the judge's actions occurred outside the presence of the jury. *Id.* at 1139-40; *see Moody*,
841 So. 2d at 1090.   The state also cited to *Williams v. State*, 539 So. 2d 1049, 1052-53 (Miss.
1989), where the court reversed the trial judge's failure to grant a mistrial after the prosecutor,
through the use of a hand gesture, encouraged an answer posed by defense counsel on cross-
examination of the state's witness.

44

*Moody*, 841 So. 2d at 1089, 1090.

The court agrees with the state supreme court that the judge in no way inserted himself into the prosecution's case. Rather, the judge took actions "in order to develop the record to assure that the witness, a law enforcement official, clearly understood what the prosecutor was asking him so as to not inadvertently offer inadmissible and potentially prejudicial testimony." *Moody*, 841 So. 2d at 1087. As such, the court finds that the Mississippi Supreme Court's resolution of the issue was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. This claim for habeas relief must be denied.[38]

Ground Eight

In Ground Eight, petitioner argues that Count Two of the indictment is defective as a matter of law. Specifically, petitioner argues he cannot be liable for the capital murder of William Hatcher based on the underlying felony of the sexual battery of Robbie Bond, because "[t]he state cannot take up the sexual battery of one person and attach it to the murder of another just to make that murder eligible for the death penalty." *See* Petition at 8; Memo at 37-38.

The Mississippi Supreme Court rejected this argument in petitioner's direct appeal, based on the unambiguous language of the capital murder statute.[39] *Moody*, 841 So. 2d at 1091. In its analysis, the court cited *West v. State*, 553 So. 2d 8, 13 (Miss. 1989), a case involving a capital murder conviction with the underlying felony being sexual battery, where the court stated: "An

---

[38] As an aside, the court notes that there no evidence anywhere in the record suggesting that Richard Moody may have committed the murders.

[39] Under Mississippi law, capital murder is defined, in pertinent part, as murder "done with or without any design to effect death, by any person engaged in the commission of the crime of...sexual battery...or in any attempt to commit [sexual battery]." Miss. Code Ann. § 97-3-19(2)(e). Count Two of the indictment charges that petitioner "unlawfully, wilfully and feloniously, with malice aforethought," murdered Hatcher "while engaged in the commission of...sexual battery" on Robbie Bond. SCR 9.

indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony."  The court also cited to *Pickle v. State*, 345 So. 2d 623, 626 (Miss. 1977), where it held that "[t]he res gestae of the underlying crime begins where an indictable attempt is reached and ends where the chain of events between the attempted crime or completed felony is broken."  Ultimately, the court concluded that in the case *sub judice*, there was never a break in the chain of events because the record revealed that petitioner first killed Hatcher, then immediately thereafter sexually assaulted and killed Bond, and therefore petitioner's actions fell within the purview of Mississippi's capital murder statute.  *Id.* at 1092.

The sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment was so defective that the convicting court had no jurisdiction. *Riley v. Cockrell*, 339 F.3d 308, 313-14 (5th Cir. 2003), *cert. denied*, 543 U.S. 1056 (2005); *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994) (citation omitted).  Moreover, "[w]here the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue."  *McKay*, 12 F.3d at 68; *see also Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).  Indeed, a state's interpretation of its own laws is no basis for federal habeas corpus relief since no constitutional question is involved.  *Bronstein v. Wainwright*, 646 F.2d 1048, 1050 (5th Cir. 1981); *see also Wainwright v. Goode*, 464 U.S. 78, 84 (1983) (citations omitted) (stating that "the views of the state's highest court with respect to state law are binding on the federal courts.").  Because a federal habeas court "take[s] the word" of the state's highest court as to interpretation of its laws on a criminal matter and does not "sit to review" that interpretation, *Jackson v. Anderson*, 112 F.3d 823, 825 (5th Cir. 1997), this court must "defer to [the] implicit conclusion and interpretation of state law" by the state court.  *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir.

2004).  Petitioner presented his defective indictment claim on direct appeal to the Mississippi

Supreme Court, and that claim was examined and rejected by that court.  Accordingly, this issue

of state law provides no basis for habeas relief.


Ground Nine

In Ground Nine, petitioner argues that the evidence was insufficient to support a

conviction on Count Two of the indictment - the capital murder of William Hatcher.

Insufficiency of the evidence can support a claim for habeas relief only if the evidence,

when viewed in the light most favorable to the State, is such that no "rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt."  *Santellan v. Cockrell*,

271 F.3d 190, 193 (5th Cir. 2001) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see*

*also Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000).[40]   This standard of review allows the trier

of fact to find the evidence sufficient to support a conviction, even if "the facts also support one or

more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gilley v.*

*Collins*, 968 F.2d 465, 468 (5th Cir. 1992) (citation omitted).  Thus, it "preserves the integrity of

the trier of fact as the weigher of the evidence."  *Bujol v. Cain*, 713 F.2d 112, 115 (5th Cir. 1983).

Petitioner argues that Hatcher was "certainly unconscious and probably dead" when the

sexual battery was committed upon Bond (citing Dr. Haynes' autopsy results, *see* Tr. 2154);

therefore, according to petitioner, Hatcher's murder could not have been capital murder because

there is no evidence that the intent to sexually batter Bonds was formed prior to or at the time that

Hatcher was killed nor is there evidence that petitioner killed Hatcher to facilitate the sexual

---

[40] This standard of review is applied with "explicit reference to the substantive elements
of the criminal offense as defined by state law."  *Dupuy*, 201 F.3d at 589 (*quoting Jackson v.*
*Virginia*, 443 U.S. 307, 324 n.16 (1979)).

battery on Bond.  *See* Petition at 8-9; Memo at 37-38.  On direct appeal, the Mississippi Supreme

Court rejected petitioner's argument:

> As the State points out, intent to sexually batter Bond
> could be inferred from the actions of Moody, who had
> to first incapacitate Hatcher in order to get to Bond.
> This is a reasonable inference which may reasonably
> be drawn from the evidence.  The jury by its verdict
> obviously found that this was Moody's purpose.
> Moody would have us believe that the intent to
> sexually batter Bond was not formed until after the
> death of Hatcher - that there was a break in the chain
> of events whereby Hatcher had been dead before it
> ever entered Moody's mind to sexually batter Bond.
> As the State argued in its brief, the 'crimes against
> Hatcher and Bond were so intertwined that they
> constituted a continuous act.'  There was certainly
> more than sufficient evidence in the case sub judice
> for the jury to find that Moody possessed the requisite
> intent to sexually batter Bond before the murder of
> Hatcher and, according [*sic*], the guilty verdict is
> beyond our ability or authority to disturb.[41]

*Moody*, 841 So. 2d at 1092-93.  The court stated further that "[i]ntent to do an act or commit a

crime is also a question of fact to be gleaned by the jury from the facts shown in each case...[It]

can be determined only by the act itself, surrounding circumstances, and expressions made by the

actor with reference to his intent."  *Id.* (*quoting Walker v. State*, 671 So. 2d 581 (Miss. 1995)).

"While Moody may not have expressed his intent, there is no doubt that his intent to sexually

assault and batter Robbie Bond was proven by his actions and the surrounding circumstances."

*Id.*

---

[41] Moreover, as the state court noted, "[t]he fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge." *Moody*, 841 So. 2d at 1092 (*citing West*, 553 So.2d at 13).  "Application of the felony-murder doctrine does not require that the underlying crime shall have been technically completed at the time of the homicide, nor does it matter at what point during the commission of the underlying felony the homicide occurs." *Id.* (*citing Pickle*, 345 So. 2d at 626).

Based on the foregoing, the court finds that the state court's decision was not contrary to or an unreasonable application of clearly established federal law, and habeas relief on this claim is hereby denied.

Ground Ten

In Ground Ten, petitioner argues that Jody Newell's testimony as to the vaginal swabs and slides pertaining to Robbie Bond should not have been allowed by the trial court because Newell did not take the samples herself, she had no specific recollection of the samples taken in the instant case, and she did not generate a report concerning the autopsy, but rather she reviewed Dr. Ward's report.[42]  Petition at 9-10.  Petitioner relies on Rules 602 and 703 of the Mississippi Rules of Evidence[43] to support his claim that it was error for the trial court to allow Ms. Newell to testify to "general, second hand information."  Memo at 40.

The record reflects that Ms. Newell was present when Dr. Ward conducted Robbie Bond's autopsy and that she observed Dr. Ward collect the vaginal swabs in question.  Ms. Newell testified as to the general procedure followed by Dr. Ward and herself when collecting vaginal swabs for evidence and indicated that this procedure was followed in the case of Robbie Bond.  On cross-examination, Ms. Newell stated that due to the amount of time that had passed since the

---

[42] Jody Newell was employed as a medical examiner assistant and assisted the medical examiner, Dr. Emily Ward, with Robbie Bond's autopsy.  *See* Tr. 2035-36.  Dr. Ward did not testify at trial.

[43] Rules 602 and 703 of the Mississippi Rules of Evidence mirror their counterparts in the Federal Rules of Evidence.  Rule 602 provides, in pertinent part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."  Rule 703, which governs the bases of opinion testimony by experts, states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

autopsy, she could not recall this specific autopsy on Bond but indicated that the same procedure for the collection of sexual assault evidence was followed in every case.  Tr. 2036, 2039.

"A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair."  *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999), *rehg & reh'g en banc denied*, 184 F.3d 820 (1999) (citation omitted).  On appeal, the Mississippi Supreme Court held that "[t]he trial judge did not abuse his discretion[44] in allowing the testimony of Newell, as she had the requisite knowledge of that about which she was testifying."  *Moody*, 841 So. 2d at 1094.  Further, the Court stated: "Once the evidence was received, it was for the jury to determine what weight and credit to give the evidence based on Newell's admission that she did not recall this particular autopsy."  *Id.* at 1094.  This court agrees with the state court that the trial judge did not abuse his discretion in allowing Newell's testimony, and that his ruling did not violate petitioner's constitutional rights nor render his trial fundamentally unfair.  Accordingly, there is no basis for habeas relief on this claim.

Ground Eleven

In Ground Eleven, petitioner argues that the DNA evidence introduced at trial was unreliable - specifically, that Gina Pineda's[45] testimony should not have been allowed because the facility that conducted the DNA testing in the instant case, Reliagene Technologies, had no

---

[44] "'The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused.'"  *Moody*, 841 So. 2d at 1094 (*quoting Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)).

[45] Gina Pineda testified as an expert in DNA testing.  She was employed by Reliagene Technologies, the company that conducted the DNA testing in the instant case.  Tr. 2205.  The DNA of sperm cells found on a vaginal slide taken from Bond during the autopsy was compared by Reliagene to a known DNA sample of petitioner and were found to be consistent.  *Id.* at 2236-38, 2244-45.

reliable scientific test for "low level contaminated and degraded DNA samples."  Petition at 10;

Memo at 41-44.  As noted above, petitioner only has a cognizable federal habeas claim if the

challenged evidentiary ruling violated his constitutional rights or rendered his trial unfair.  *See*

*Johnson*, 176 F.3d at 820 (citation omitted).

Ms. Pineda testified that Reliagene was an accredited testing facility and that Reliagene

had previously conducted in-house validation studies of degraded DNA.  Tr. 2207-08, 2255-57.

The record reflects that Ms. Pineda testified extensively both at trial, and at an earlier hearing on

petitioner's motion *in limine* to exclude the DNA evidence, regarding the procedures used in

testing the DNA.  *Id.* at 348-89, 2205-90.  Ms. Pineda testified that the typing kit that was used in

this case would not give a wrong result, and that even with degraded DNA, the test Reliagene

used would just give no result at all.  *Id.* at 2218.  Petitioner attempted to argue that in order for

Pineda's testimony to be admitted, it would need to be shown that they had done in-house

validation studies of their procedures.  On cross-examination, during a suppression hearing

outside the presence of the jury, the following exchange took place:

> Q: Now, I've got one simple question for you.  Has Reliagene ever done an in-house
> laboratory validation study on a degraded sample?
> A: Yes, we have.
> Q: Do you have that here today?
> A: I have that in the form of the published paper that I said we participated in.
> Q: I heard all about that.
> A: Reliagene did part of that study, and that study included degradation studies.
> Q: I heard all that, Ms. Pineda.
> A: Okay.
> Q: I heard you testify about a paper that you participated in with 26 other companies.
> A: That's correct.
> Q: My question is simpler than that.  Has Reliagene ever performed its own
> validation study, in-house, in New Orleans, to verify y'all's work on a degraded sample.
That's a yes or no answer.
> A: Yes.
> Q: In house?
> A: Yes.

Tr. 2201-02.  Counsel for Moody argued that it was clear from Ms. Pineda's testimony that

Reliagene does not have accredited protocols for testing of degraded DNA samples; however,

outside the presence of the jury, the attorney and the trial judge had the following exchange:

> Mr. Price: Judge, I would just say on behalf of the state, I think Ms. Pineda's
> testimony establishes clearly that a validation study was done and that she previously
> testified the lab is accredited and further testified today and clarified that this
> particular work in the area of mixed sample has been done.
> The Court: That certainly appears to be the testimony, Mr. Kirksey
.

The record reveals that testimony was presented by experts on both sides addressing the

reliability of "degraded" DNA evidence.  *See*, *e.g.*, Tr. 2189-2338.  The jury was then left to

determine for themselves how much weight to give to the DNA test results.  As noted *supra*, "[a]

state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a

specific constitutional right or render the petitioner's trial fundamentally unfair."  *Johnson v.

Puckett*, 176 F.3d 809, 820 (5th Cir. 1999) (citation omitted).  After reviewing the record, the

Mississippi Supreme Court concluded that there was no abuse of discretion by the trial judge in

allowing Pineda's testimony.  *Moody*, 841 So. 2d at 1095.  This court agrees.  The court finds no

basis for federal habeas relief and therefore this claim is denied.

Ground Twelve

In Ground Twelve, petitioner asserts that the trial court erred in failing to grant a

circumstantial evidence instruction to the jury on the underlying felony of sexual battery, because

he did not confess to sexual battery and because there was no direct evidence submitted at trial to

support a charge of sexual battery.  *See* Petition at 10; Memo at 44-47.

Dr. Hayne, a private pathologist, conducted a second autopsy of the victims, the day after

Dr. Emily Ward, the State Medical Examiner, conducted her autopsies.[46]  Dr. Hayne testified that

---

[46] The prosecutor had requested that a second autopsy be performed.  Tr. 2146.

he did not find any evidence of vaginal trauma on Bond.  However, Dr. Hayne testified that vaginal trauma is not always seen in cases of sexual assault, and that it was possible and sometimes even probable for a woman - particularly a pre-menopausal woman - to suffer sexual assault without any vaginal trauma.  *Id.* at 2140, 2157-58.  Moreover, Dr. Hayne stated that the decomposition of Bond's body could have made such trauma difficult to interpret if it had been found.  In addition, Dr. Hayne testified that Bond had significant injuries all over her head, neck, and upper extremities, indicative of blunt force trauma, and that she had "defensive posturing injuries" on her arms and hands indicative of a struggle.  Dr. Hayne also testified that Bond had bruises on the front of her shins and thighs. Tr. 2120-21, 2136-38, 2140-41, 2146-47, 2156-58.

Petitioner points to the testimony of Kelly Franovich, an employee at the state crime laboratory who examined several pieces of physical evidence in this case, that there was seminal fluid on the vaginal slides taken from Bond's body, but that there was no sperm, and Gina Pineda's testimony that there was a sperm cell fraction belonging to petitioner but no seminal fluid, in support of his argument that there was only circumstantial evidence of sexual battery. Memo at 45 (*citing* Tr. 1923-39, 2194-2290); *see also* Tr. 1976-77.   However, Ms. Franovich testified that she found intact sperm cells on a vaginal slide taken from Bond during the first autopsy, which was "indicative of seminal fluid being present."   Tr. 1958-59.  The DNA of these cells was compared by Reliagene to a known DNA sample of petitioner and were found to be consistent.  *Id.* at 2236-38, 2244-45.

Under Mississippi law, "[a] defendant is entitled to a circumstantial evidence instruction, upon request, when the evidence for the prosecution is wholly circumstantial."  *Parker v. State*, 606 So. 2d 1132, 1140 (Miss. 1992) (citations omitted).  The typical circumstantial evidence instruction is "beyond a reasonable doubt and to the exclusion of every reasonable hypothesis

consistent with innocence." *Id.* On direct appeal, the Mississippi Supreme Court rejected petitioner's argument that there was only circumstantial evidence concerning sexual battery. *Moody*, 841 So. 2d at 1095. The Court found that the testimony of all of the state's witnesses, including the testimony of Dr. Steven Hayne regarding the absence of sexual trauma and the testimony of Ms. Franovich regarding the existence of intact sperm cells, coupled with petitioner's confession to the murders, was sufficient "to place the issue of sexual battery beyond the realm of one on which a circumstantial evidence instruction was warranted." *Id.*

Generally, challenges to jury instructions may only form the basis for federal habeas corpus relief where the improper instruction rose to the level of a constitutional violation. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Based on the foregoing, the court finds that petitioner is not entitled to habeas relief on this claim.

Ground Thirteen[47]

In Ground Thirteen, petitioner argues that the trial court improperly denied his instruction

_____

[47] Respondents argue that this claim is procedurally barred. *See* Answer at 65. However, this court does not agree. In his appeal, it appears that petitioner originally was arguing that the trial court erred in denying a jury instruction on the lesser included offense of manslaughter on Count Two of the indictment. *See Moody*, 841 So. 2d at 1096. The Mississippi Supreme Court held that this ground was procedurally barred from review, as petitioner did not object to the denial of a manslaughter instruction at trial. *Id.* Petitioner then argued that he should have been granted an instruction on heat of passion manslaughter. The court proceeded to address the merits of this claim. *See id.* at 1096-97. Moreover, the Mississippi Supreme Court has held that "the refusal of instructions offered by the defendant need not be objected to in order to preserve the issue for appeal." *Green v. State*, 884 So. 2d 733, 736 (Miss. 2004). Rather, an error concerning the refusal of jury instructions "is procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury." *Edwards v. State*, 737 So. 2d 275, 310 (Miss. 1999) (citations omitted). The record reflects that petitioner offered instructions D18 (setting forth the difference between murder and manslaughter as the absence of deliberation and malice in murder) and D19 (defining manslaughter as, *inter alia*, killing "in the heat of passion"), which were refused by the court. *See* Tr. 266-67, 2358. Thus, this issue was sufficiently preserved for appeal and will be addressed by this court on its merits.

on heat of passion manslaughter for the murder of William Hatcher in Count Two of the
indictment.

The Mississippi Supreme Court has held that a defendant has a right to an instruction on
"a lesser crime which could be found to have been committed on the evidence before the jury."
*Toliver v. State*, 600 So. 2d 186, 192 (Miss. 1992) (Banks, J., concurring) (citation omitted); *see
also Gangl v. State*, 539 So. 2d 132, 136 (Miss. 1989) (*en banc*) (stating that a defendant "may
request an instruction regarding any offense carrying a lesser punishment if the lesser offense
arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge
laid out in the indictment.").   An instruction on a lesser-included offense is authorized "only
where there is in the record an evidentiary basis therefor."  *Moody*, 841 So. 2d at 1096-97 (*citing
Lee v. State*, 469 So. 2d 1225, 1230 (Miss. 1985); *Ruffin v. State*, 444 So. 2d 839, 840 (Miss.
1984); *Colburn v. State*, 431 So. 2d 1111, 1114 (Miss. 1983)).  Instructions on lesser-included
offenses "should not be granted indiscriminately, nor on the basis of pure speculation."  *Id.*  at
1097 (*citing Mease v. State*, 539 So. 2d 1324, 1329 (Miss. 1989)).  Such instructions should not
be granted where, "taking the evidence in the light more favorable to the accused and considering
all the reasonable inferences which may be drawn in favor of the accused from the evidence, ...no
reasonable jury could find the defendant guilty of a lesser-included offense... ."  *Id.* (*quoting
Harper v. State*, 478 So.2d 1017, 1021 (Miss. 1985)).

Manslaughter is defined under Mississippi law as follows: "The killing of a human being,
without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a
dangerous weapon, without authority of law, and not in necessary self-defense... ."  Miss. Code

Ann. § 97-3-35.  The test for heat of passion manslaughter[48] is an objective one, being whether a

reasonable person would have been so provoked.  *See Taylor v. State*, 452 So. 2d 441, 449 (Miss.

1984).  There is simply nothing in the record showing that the killings in this case were provoked.

The only "evidence" petitioner points to is his May 18, 1995 confession, which according to

petitioner, "allows for an interpretation that the killing of Hatcher was in the heat of passion."

Petition at 11.  The relevant portion of the confession, as set forth in the Mississippi Supreme

Court's opinion, is as follows:

> Fortinberry: Well what ... and then what brought it about for you to stab him and
> how how did that come about?
> Moody: Just...I left and I come back by.  When I come back by, they was just standin
> there.
> Fortinberry: You left and went across the bridge?
> Moody: Um hum.
> Fortinberry: Which...which way was you going?
> Moody: Towards their truck and I come back across.
> Fortinberry: You went down there and turned around and come back across?
> Moody: Um hum.
> Fortinberry: And that's when you stabbed him?
> Moody: Yes sir.

*Moody*, 841 So. 2d at 1096.  This court agrees with the state court that petitioner's confession

does not support an interpretation that his killing of Hatcher was in the heat of passion.  *See id.*

Moreover, the court has carefully reviewed the record and can find no other evidence to support

such an interpretation.

---

[48] "Heat of passion" has been defined as "a state of violent and uncontrollable rage
engendered by a blow or certain other provocation given...Passion or anger suddenly aroused at
the time by some immediate and reasonable provocation, by words or acts of one at the time.
The term includes an emotional state of mind characterized by anger, rage, hatred, furious
resentment or terror."  *Underwood v. State*, 708 So. 2d 18, 36 (Miss. 1998) (citation omitted).
"The passion felt by the person committing the act 'should be superinduced by some insult,
provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily
constituted men, the highest degree of exasperation.'"  *Graham v. State*, 582 So. 2d 1014, 1018
(Miss. 1991) (citation omitted).

Thus, this court agrees with the Mississippi Supreme Court's conclusion that the granting of an instruction on heat of passion manslaughter in this case would have been "purely speculative and not supported by the evidence" and, therefore, that the trial judge properly denied this instruction. *Moody*, 841 So. 2d at 1097; *see also Agnew v. State*, 783 So.2d 699, 702 (Miss. 2001) (where defendant's heat of passion argument was purely speculative and devoid of any evidentiary support, defendant not entitled to instruction on manslaughter); *Anderson v. State*, 914 So. 2d 1239, 1243 (Miss Ct. App. 2005), *cert. dismissed*, 927 So.2d 750 (Miss. 2006) (holding defendant not entitled to heat of passion manslaughter instruction where no evidence he acted in heat of passion).[49]

For the foregoing reasons, petitioner is not entitled to habeas relief on this claim.

Ground Fourteen

In Ground Fourteen, petitioner argues that the trial court erred in not instructing the jury that there were three sentencing options available for a capital murder conviction: death, life, and life without parole. Rather, at the sentencing phase of the trial, the judge instructed the jury that there were only two sentencing options available: death and life without parole. SCR 280-87.[50]

---

[49] Petitioner also argues that because there was no proof as to why he killed Hatcher, the jury could have found him guilty of manslaughter. Memo at 47. The court notes that this particular argument was not raised in petitioner's direct appeal, nor in his application for post-conviction relief. Therefore, it appears that petitioner has not exhausted his remedies on this claim and it is barred from review. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999). At any rate, as discussed above, there is no evidence in the record to support a manslaughter instruction and therefore this argument is disposed of on its merits. *See* 22 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[50] When the jury could not unanimously agree on punishment, petitioner was then sentenced by the judge to two consecutive terms of life imprisonment, pursuant to Miss. Code Ann. § 99-19-101(c)(3). The trial judge originally had sentenced petitioner to life without parole, SCR 333, but in the Amended Sentencing Order, which superceded the previous order, the judge

Petitioner argues that because the sentencing instructions provided for only two sentencing options instead of three, the court's instructions were in direct conflict with the sentencing scheme provided by Section 99-19-101 of the Mississippi Code Annotated.[51]

Petitioner is correct that Section 99-19-101(1) sets forth a sentencing scheme with three options which reads, in pertinent part, as follows: "Upon conviction or adjudication of guilt of a defendant of capital murder...the court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment."  However, this section must be read in conjunction with two other relevant Code sections.  Section 97-3-21 provides: "Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in section 47-7-3(1)(f).  Section 47-7-3(1)(f) provides: "No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101."

The court agrees with respondent that reading these sections together, it is clear that the only possible sentences available to the jury in the instant case were death or life without parole. Moreover, the Mississippi Supreme Court has since addressed this very issue and has interpreted

---

sentenced petitioner to life.  *Id.* at 330-32.

[51] Petitioner also argues that the instructions contradicted the Mississippi Supreme Court's mandate, upon remand to the trial court after holding that the judge had to enforce petitioner's plea agreement.  In its opinion, the Court stated: "An important fact is that, here, the trial court was not vested with any sentencing options.  Moody stood charged with capital murder.  Under the sentencing scheme of Miss. Code Ann. § 99-19-101, a jury would have to sentence Moody to death, life imprisonment without parole, *or simply life imprisonment*." *Moody*, 716 So. 2d at 595 (emphasis added).  The trial judge stated that he did have some concerns that the mandate mentioned the three sentencing options, but notwithstanding that, he was going to just mention the two options.  Tr. 785, 2359.

the three statutory provisions to mean that defendants in capital murder cases can only receive death or life imprisonment with parole.  *See*, *e.g.*, *Branch v. State*, 882 So. 2d 36, 79 (Miss. 2004), *cert. denied*, 544 U.S. 907 (2005) (finding no error where trial court, in capital murder case, did not instruct jury on third option of life); *Flowers v. State*, 842 So. 2d 531, 540 (Miss. 2003) ("The reading of these statutes together indicate that a defendant on trial for capital murder may only be sentenced to death or life imprisonment without the eligibility of parole.  According to 47-7-3(1)(f), there is no longer the possibility of life imprisonment."); *Pham v. State*, 716 So. 2d 1100, 1103 (Miss. 1998) (stating, in case where state was not seeking death penalty, that "the only possible sentence for conviction of capital murder committed after July 1, 1994, the effective date of § 47-7-3, is life without parole.").  At any rate, petitioner received the most lenient sentence available under Mississippi law - life imprisonment.  *See* SCR 330-32.  The court finds no basis for federal habeas corpus relief.[52]

Ground Fifteen

   In Ground Fifteen, petitioner argues that he was denied his right to a fair trial when state's witness John Grafton referenced David Moody's prior trial, in response to a question by defense counsel on cross-examination.

_____

   [52] Petitioner makes one additional argument in support of this claim.  Petitioner argues that had the judge given the jury the three requested sentencing options, "surely any reasonable minded jury would have agreed to life without [parole], before allowing defendant to get life for their [*sic*] failure to agree."  Memo at 48-49.  In that situation, petitioner argues, if he were successful in obtaining a new trial, he could not then be subjected to the death penalty.  *Id.* at 49.  Although it is somewhat hard for this court to discern, it appears to be a double jeopardy claim. *See* Reply at 10.  Without addressing the merits of such a claim, the court rejects this argument on the basis that it has already found that the sentencing instructions given by the judge were a correct statement of Mississippi law.  Moreover, petitioner's speculation as to what a "reasonable minded jury" would have done is just that - speculation.  Finally, the court notes that it is highly improbable that petitioner will be granted a new trial, as he has exhausted his remedies in the state courts and has failed to receive a new trial, nor will this court be granting petitioner a new trial.

The improper remark in question was made by Mr. Grafton during petitioner's attorney's attempt to impeach Mr. Grafton with previous sworn testimony.  The exchange between defense counsel and Grafton is as follows:

> Q: And I believe there was another occasion you had given sworn testimony concerning the events surrounding that week, etc., and you failed to disclose that on your sworn testimony as well; is that true?
> A: I was not asked about that.
> Q: Okay. You were not asked about it?
> A: Right.
> Q: Okay. And you went over your statement, and before you gave that testimony at that particular time, and it was not asked and you did not volunteer it?
> A: Right.
> Q: Okay. You didn't think that was important at that point in time?
> A: Not at that point in time, no, sir.
> Q: Okay. And when did you tell some law enforcement or the law enforcement team about this sighting?
> A: When did I tell them about -
> Q: When did you first tell them about the sighting?
> A: Probably when - the last trial I attended.

Tr. 1556-58.

Shortly thereafter, the judge, recognizing that the testimony was getting into matters that would not be admissible, excused the jury from the courtroom and cautioned the attorneys.[53] Defense counsel then moved for a mistrial based on Mr. Grafton's reference to "the last trial I attended."  Following the discussion with the attorneys and after the judge had all of the witnesses brought in so that he could admonish them about future testimony, the trial judge gave a precautionary instruction to the jury to disregard Mr. Grafton's reference to the "last trial."  The jury then swore under oath that they would disregard that portion of Mr. Grafton's testimony. Tr. 1557-67.

---

[53] Prior to petitioner's trial, his cousin David Moody was tried and convicted.  The record shows that in the instant case, the trial judge instructed the attorneys to stay far away from matters that might involve comments on David's trial and witnesses were admonished not to make any such references. *See, e.g.*, Tr. 1562-63.

Petitioner argues that he was prejudiced because the jury was left with the impression that he had another trial, and that in order to overcome this impression, he would have to testify. Memo at 49.  In addressing issues of improper comments from both witnesses and attorneys, the Fifth Circuit has often held that if any prejudice resulted, an instruction to the jury to disregard the comment was sufficient to cure the prejudice.  *See*, *e.g.*, *U.S. v. Wallace*, 32 F.3d 921, 927 (5th Cir. 1994); *U.S. v. Martino*, 648 F.2d 367, 390-91 (5th Cir. 1981), *vacated in part on other grounds*, 650 F.2d 651 (5th Cir. 1981).  Moreover, as the Fifth Circuit has stated:  "Allegedly improper statements should not be viewed in the abstract.  The question is what impact they had in the context of the particular trial in terms of their relevance and the quantity of untainted evidence in the case."  *Martino*, 648 F.2d at 391 (*quoting U.S. v. Hyde*, 448 F.2d 815, 847 (5th Cir. 1971)).

The court agrees that petitioner cannot establish prejudice, as any potential prejudice stemming from this one stray remark would have been cured by the judge's instruction to the jury. And even if prejudice had not been cured in this case, federal courts may grant habeas relief only where trial error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), *reh'g denied*, 508 U.S. 968 (1993). Petitioner cannot make such a showing.  Accordingly, this claim does not provide a basis for habeas relief.

Ground Sixteen

In Ground Sixteen, petitioner alleges that discovery violations by the state deprived him of his right to due process and a fair trial.  Petitioner cites to four specific instances in which he claims that the defense was unduly surprised by testimony offered by the state's witnesses.  *See* Petition at 11.

61

First, petitioner complains about the testimony of Officer Danny Rigel in which he testified that David Moody accompanied him to petitioner's residence and pointed with his foot to an area behind petitioner's trailer that was subsequently determined to be the gravesite of the victims.  *See* Petition at 11; Tr. 2026-29.  The record reflects that, prior to Rigel's testimony, a conference was held outside the presence of the jury in which Mr. Kirksey objected vigorously to Officer Rigel being permitted to testify about David showing him the gravesite, because he had only been made aware of the substance of this testimony ten minutes beforehand.  Tr. 2008-09. Mr. Kirksey acknowledged that he was aware that Officer Rigel was going to testify (he was listed as a potential witness before trial in the list given by the state to defense counsel) but that he had not been provided with any information indicating the specific testimony regarding the gravesite. *Id.* at 2009-10.  The state pointed to two documents containing the information in dispute, including an offense report by one of the police officers, and asserted that all documents had been provided in discovery.  *Id.* at 2009, 2012, 2006-18.  Mr. Kirksey, noting the numerous changes in defense counsel, stated that while discovery materials had been passed on to him from the previous defense attorneys, he was unaware of any documents containing information about what the substance of Officer Rigel's testimony was going to be.[54]  SCR 2012-16.   The judge allowed defense counsel a few minutes to interview Officer Rigel before he testified.  Tr. 2019-20.

In his second allegation, petitioner complains that Richard Moody's[55] testimony went

---

[54] The trial judge rejected this argument because both documents provided in discovery referenced the fact that David Moody had indicated to Officer Rigel where the graves were located, and therefore they were sufficient to put the defendant on notice as to the substance of the proposed testimony.  *See* Tr. 2012, 2106-18.  The state also pointed out that Officer Rigel had testified to the same information in David Moody's trial and Mr. Kirksey indicated that he had received a transcript of those proceedings.  *Id.* at 2020-22.

[55] Richard Moody was never charged in connection with the murders of either Bond or Hatcher.  He did, however, plead guilty to the crime of accessory after the fact to murder, and

beyond the information provided to his attorney in discovery and that the state had not disclosed that it intended to call him. *See* Petition at 11.   Prior to Richard taking the stand, petitioner's attorney objected to any additional testimony beyond what was contained in the statement provided in discovery. Tr. 2170-71.  In response, the state indicated that any additional testimony would not have been covered in any previous statements, because it was being offered to rebut the defense's theory (developed during cross-examination of some of the state's witnesses) regarding Richard's involvement in the crimes charged. *Id.* at 2172.  The state argued that it had not anticipated that petitioner's defense would be that Richard was a potential perpetrator of the crimes. *Id.*  The trial judge ruled that he would determine how far he would allow the testimony to go on a question-by-question basis. *Id.*  The record reflects that during the testimony, petitioner's attorney objected once to improper redirect examination and the objection was sustained. *Id.* at 2184-85.

        The third and fourth allegations of a discovery violation involve the testimony of Dana Moore and John Grafton (former co-workers of the victims).   *See* Petition at 11.  Ms. Moore testified that she saw petitioner driving across the bridge at the crime scene during the search for the victims.  Ms. Moore also testified that she heard petitioner respond negatively to someone's question of whether he had seen anyone "out there" (referring to the bridge area where the victims were initially attacked).  At that point, petitioner's counsel approached the bench and moved to exclude any testimony regarding what petitioner might have said on the basis that the state had failed to disclose the information in discovery.  The state indicated that it did not know until the witness started testifying that she had information regarding anything that petitioner allegedly said

---

manslaughter, relating to an entirely different incident.  Pursuant to his plea agreement in that case, Richard testified at petitioner's trial. *See* Tr. 2170-71, 2173-74, 2180, 2184.

at that sighting.  Subsequently, upon agreement by the parties, Ms. Moore was admonished by the court to refrain from any testimony regarding anything petitioner might have said.  The judge then asked defense counsel if he wanted the court to instruct the jury to disregard the testimony, and defense counsel indicated that he did not want an instruction.  Tr. 1503-08, 1511.

A short while later petitioner's attorney objected to Ms. Moore's testimony regarding the truck, as he had not been provided any statement containing this testimony,[56] that it had not been mentioned in a statement she had previously given to law enforcement, and that it had also not been mentioned in her prior sworn testimony at David Moody' trial.  However, the prosecutor made it clear that it was only after Ms. Moore gave her testimony in David Moody's trial that she informed him that she had seen petitioner driving across the bridge.  Again, petitioner's attorney was offered an instruction to the jury to disregard the testimony, which he refused.  It is also worth noting that petitioner's attorney cross-examined Ms. Moore on this testimony - and elicited from her an admission that she had not previously disclosed this information in a statement given to law enforcement officers or in her prior sworn testimony.  Tr. 1512-18, 1532-34.

John Grafton's testimony immediately followed.  The record reflects that prior to Mr. Grafton's testimony, petitioner's counsel objected for the same reasons that he had objected to Moore's testimony.  The state indicated that Mr. Grafton would not be testifying about any alleged statements made by petitioner at the crime scene.  The court overruled the objection, stating: "Note for the record that the State did supplement, even though it may have been late."  No other

---

[56] Rule 9.04(A) of the UCCCR provides that with respect to "witnesses in chief proposed to be offered by the prosecution at trial," the prosecution must disclose to defendant a copy "of any statement, written, recorded or otherwise reserved of each such witness and the substance of any oral statement made by any such witness...which is in the possession, custody, control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution."

64

objections relating to discovery were made during Mr. Grafton's testimony.  As with Ms. Moore, petitioner's attorney cross-examined Mr. Grafton on this testimony - and elicited from him an admission that he had not previously disclosed this information in a statement given to law enforcement officers or in his prior sworn testimony.  Tr. 1539-65.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In order to establish a violation of the so-called *Brady* rule, a defendant must prove: 1) evidence was suppressed; 2) the suppressed evidence was favorable to the defense; and 3) the suppressed evidence was material to either guilt or punishment.  *Smith v. Black*, 904 F.2d 950, 963 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992). Undisclosed evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*  "Only when omitted evidence is deemed material can a defendant successfully claim that nondisclosure deprived him of his constitutional right to a fair trial."  *Porretto v. Stalder*, 834 F.2d 461, 464 (5th Cir. 1987).

The court agrees with respondents that petitioner cannot meet this standard.  First, it is not at all clear that the evidence was suppressed, as in each instance petitioner's counsel had been made aware of the content of the testimony, which the exception of the oral statement attributed to petitioner at the scene of the crime, which was immediately addressed by the court.  The only true complaint petitioner has regarding discovery is that the state, at times, was late in supplementing

the discovery requests in violation of UCCCR Rule 9.04,[57] and even that is debatable.   Second, there is nothing in the record to indicate that this evidence was even remotely favorable to the defense.  Third, petitioner fails to demonstrate how the evidence was material to the defense.  The only argument petitioner offers is that had he known about the witnesses seeing him drive by the crime scene, he would have subpoenaed the passenger that was with him at the time, not to rebut that he did not drive by but, rather, to demonstrate that he was not doing anything wrong as he passed - which "un-questionably [*sic*] would have been helpfull [*sic*] to the defense strategy." Petitioner does not even indicate what this potential witness would have said.  *See* Memo at 50.

Finally, even if petitioner could satisfy the first two prongs of *Brady*, there is no reasonable probability that the outcome of the trial would have been different had the alleged "suppressed" evidence been disclosed - in light of all the other evidence in the record.

Accordingly, the court finds that the state court's decision was not contrary to or an unreasonable application of clearly established federal law, and habeas relief on this claim is hereby denied.

CONCLUSION

For the reasons stated above, each of petitioner's claims for habeas relief is denied on the merits.  Accordingly, his Petition for Writ of Habeas Corpus must be denied in all respects and this case dismissed with prejudice.

IT IS THEREFORE ORDERED that Kenneth Moody's Petition for Writ of Habeas

---

[57] *See*, *e.g.*, Tr. 1517-18, 1537-38, 2018-19.  Rule 9.04(E) of the Uniform Rules of Circuit and County Court Practice (UCCCR) provides: "Both the state and the defendant have a duty to timely supplement discovery.  If, subsequent to compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, that party shall promptly notify the other party or the other party's attorney of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified."

Corpus [1] is dismissed with prejudice.

A separate judgment shall be entered herein in accordance with Federal Rule of Civil

Procedure 58.

SO ORDERED this, the 18th day of September, 2007.


s/Keith Starrett
UNITED STATES DISTRICT JUDGE